NUMBER 13-05-493-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 



IN THE INTEREST OF M.S.R. AND S.R., CHILDREN

 





On appeal from County Court at Law No. 1 

of Hidalgo County, Texas.


 



DISSENTING MEMORANDUM OPINION



Before Justices Yanez, Benavides and Vela 

Dissenting Memorandum Opinion by Justice Vela

 

 I respectfully dissent. Based on the evidence presented during this five-day,
hotly-contested conservatorship bench trial, I believe the trial court's ruling was
overwhelmingly within its broad discretion. First, I disagree with the majority because
I believe the trial court's ruling amounted to a temporary suspension of access to the
children, not a termination; and thus, evidence of extreme grounds was unnecessary
to uphold the trial court's discretionary ruling. Second, even if the trial court's ruling
could possibly be construed as a termination, the trial court did not abuse its discretion
because the circumstances were, in fact, extreme. Third, the majority bases its ruling,
in part, on cases involving involuntary termination of parental rights, which require the
evidence to be clear and convincing. The majority should have reviewed the trial
court's ruling under the more deferential abuse of discretion standard.

I.

Background Facts

 Because this was a hard-fought, contested, lengthy bench trial in which the
testimony was often heated, conflicting, and disturbing, I feel it necessary to set forth
important evidence that was introduced at trial to demonstrate the reasons why I
believe the trial court did not abuse its discretion.

A. Ahmed's Limited Involvement with her Children

 Ahmed and Rashid divorced in Houston in 1998 when their two children, M.S.R
and S.R, were ages 5 and 2. Shortly after the separation, the children began to live
with Rashid. (1) Although designated as a joint managing conservator, Ahmed voluntarily
gave custody of the children to Rashid, and showed merely a passive interest in her
children over the next few years. In 1998, Rashid moved to McAllen with the children
and set up a medical practice. Ahmed, for the most part, lived in Chicago with her
parents and attended law school. (2) The children would visit her in the summers during
summer vacation. From 1998 until 2003, Ahmed visited the children only twice in
McAllen, and on both occasions, the visits were very brief. (3) 

B. 2003: Ahmed Refuses to Return Children

 On May 27, 2003, Rashid sent the children to Chicago for their annual summer
visitation with Ahmed. Although she had not seen her children for 10 months, Ahmed
did not pick up the children at the airport because she was "busy" and was not able
to change her other "engagement." Instead, she called Rashid's brother and asked him
to take the children to his house. She picked up the children later that day. On June 13, 2003, Ahmed notified Rashid that she would not be returning the
children to McAllen. Rashid notified Ahmed that if she failed to return the children,
she would be in violation of the divorce decree after Ahmed refused to return the
children. Rashid filed a motion for contempt. The Houston (4) court ordered the children
returned to Rashid, and ordered that Ahmed have limited supervised visitation. (5) As a
result of her refusal to return the children, MSR and SR missed five weeks of school. (6)

C. 2004: Ahmed moves to the Rio Grande Valley financed by Dr. Chowdhury 

 In December 2004, Ahmed moved to the McAllen/Mission area in Hidalgo
County. The evidence showed that her move was financed by Dr. Chowdhury, a
former employer of Rashid who was under federal investigation. Rashid had
cooperated with authorities and was going to testify against Chowdhury in his
prosecution. The record reflects that Chowdhury's investigator contacted Ahmed in
Chicago, Chowdhury financed Ahmed's move to Hidalgo County, Chowdhury paid
Ahmed's hotel bill until she found an apartment, Ahmed moved into an apartment with
Chowdhury's son's girlfriend, and Chowdhury's assistant drove Ahmed to the
courthouse for at least one hearing regarding the children. Rashid described
Chowdhury's involvement with Ahmed:

 Q: [by Rashid's counsel] You made some comment about the - - that you
felt that the children were not - and I am quoting. You said, "The
children are not in a safe environment" and that "in connection with" - -
and you said something like "in connection - between Dr. Chowdhury
and my ex-wife." Are you . . . making reference to that whole situation
with the federal investigation? Is that what you were talking about?


 Rashid: Yes, indeed. It is a big thing going on right now.


 Counsel: And do you fear for your children's safety in that regard?


 Rashid: Absolutely.


* * * * *


 Rashid: I have a fear, and that fear is legitimate, that the safety of my 
family is at stake, not through her, through her agents as well. 

 

 Rashid: I am extremely scared the - of this kind of scale of involvement,
I am truly scared - and I am going to contact the government for
seeking the protection because I think that my life is not safe. My
car has been-my truck has been slashed, the tires, and I do not
know who was behind it. I live in a gated community, and all of
those people who live there, they are physicians or attorneys. And
we - I was very shocked and I have the report here. 


 * * * * * 


 

 On cross-examination, Ahmed's counsel questioned Rashid about why he feared
for his children.

 Counsel: [E]arlier you testified that you were asking the Court for
protection from fear because you had a fear for these
children. What exactly did you mean by that?


 Rashid: I have the fears that right now the people are - that she has
associated with some people and those people are out there
to harm me. And along with that, what she has done - she
has proven that connection that she can go at any length to
associate with those people to hurt these children and
indirectly me - or me or the children.


 * * * * *

 Counsel: What you are asking the Court is for supervised visitation?


 Rashid: Indeed until - but again under certain conditions before --we make sure that everything is safe and it has been
addressed.


 Counsel: [A]nd how are we going to do that?


 Rashid: At this point in time, I do not know that - what else is
ruined because of what type of connection she has with
this Dr. Chowdhury because she is right now being
supported by him in this town. . . .


D. Ahmed's Harassing Behavior


 Upon arrival in McAllen, Ahmed twice violated the Court's order by showing up 
at the children's home and school unannounced. She took a police officer to Rashid's
home, informing him that she had custody papers that entitled her to take the children. 
The officer testified that he did not allow Ahmed to take the children because Ahmed
could not give him an address where she was residing, she had an out-of-state driver's
license, the children seemed "comfortable" in Rashid's home, and they told the officer
they did not want to go with their mother. (7) 

 Ahmed also began attending the same mosque as Rashid and the children and
embarked on what Rashid described as a "character assassination" against him to the
other members of the congregation. While at the mosque, she attempted to approach
M.S.R. and S.R. This "disturbed and embarrassed" M.S.R., the older child. Rashid
and the children stopped going to the mosque because of Ahmed's behavior.

 Dahlinda Garcia, the guardian ad litem for the children, also described her
concerns about Ahmed's behavior. Garcia testified that during a recent supervised
visit with the children at a McAllen restaurant, Ahmed began yelling and pointing her
finger at Garcia in front of the children, and made such a scene that the restaurant
manager tried to calm her down. Eventually, the police arrived and ordered them to
leave the premises.

 Mary Villareal, Rashid's former secretary who was later hired by Dr. Chowdhury,
testified that she received a phone call from Ahmed prior to the modification hearing
asking for her help finding negative information regarding Rashid.

 E. Ahmed's Threat to Kill Herself and Her Children.

 In addition to the foregoing evidence, the trial court also heard a recorded
audiotape of a heated telephone conversation between Rashid and Ahmed, in which
Ahmed threatened to kill herself and the children: (8)

 Ahmed: If I kill the children can you prove it?


 Rashid: No, here on one hand you're telling me that these are your
children, you love them, right?


 * * * * *


 

 Rashid: [Y]ou're going ahead and you're telling me that you're going to kill
them?


 Ahmed: I have suffered much at your hands. There is a limit. . . .


 * * * * *



 Ahmed: Even God will forgive me when I kill myself. . . .


 * * * * *


 

 Ahmed: I will do you one really big last favor. . . . 


 Rashid: What is it?


 Ahmed: And . . . in this way you will be completely free of me and
there will be no connection between us. 


 Rashid: That's whatever you want to do ok? This between you and
your God . . . and here I'm just telling one thing, for sure .
. . that if you want to be with these children . . . . 


 Ahmed: I'll be with them.


 Rashid: Ok.


 Ahmed: I'll be with them alright.


 Rashid: Yeah.


 Ahmed: [A]nd there will be no power on earth that can . . .


 Rashid: [Y]eah, I know that you . . . if you are threatening me to kill them
or something? Your [sic] doing wrong, I'm just telling you . . .
Honest to God, you are doing a very bad mistake to these little
children, you will traumatize them . . . .


 Rashid: Samima, Samima, Samima, [sic] for God sake please do not do
that please I'm telling you please.


 Ahmed: [Y]ou know just like I have felt . . . they will happily die with me
. . . perhaps.


 * * * * *


 Ahmed: [T]here is only one way to break this thing[,] Shahid.


 Ahmed: [A]nd I am saying that as long as the children are there . . . yours
and my connection will not be released.


* * * * *


 

 Ahmed: Yaaaaaaaaa . . . . We'll see how clear your conscience will feel l
[sic] you will not be in your childrens . . . you won't cry over my
dead body I know that . . . but over your children's bodies . . . it
will hurt you?


 Rashid: Listen[,] Samima [sic].


 Ahmed: Will it hurt? Will it hurt you? I am asking . . . your teeny tiny son.

 

 Concerning this conversation, Rashid testified:

 During that conversation, which was very - it was very intense. 
She wanted to kill the children. That is what she expressed, and
so this way she could hurt me. And she has expressed that. I
love my children so much, and that is the only way that she could
hurt me for the rest of my life . . . .


 What she expressed clearly in that conversation she has proved
that she is serious about it, and it has been proved in this Court
that she can confer with anyone to hurt me or harm me and to the
extent that now I do believe that there may end up to be some
extreme situations like hurting me or my children.


 On cross-examination, Ahmed testified that she was just "joking" when she told
Rashid she would kill her children and that she "tried to shake him into reality here."

II. 


The Trial Court's Order


In making its oral rendition, the court stated:

 

 This is not an easy decision because it involves children, and the court
always has to look at is what is in the best interest of the children . . .
. There are some factors that I have to look at throughout the
proceeding and throughout the testimony that has been elicited by the
witnesses, and those factors that I will point out at this time and also
factors that concern the Court.

 

 First of all, with respect to the hostile environment or hostile behavior,
there have been at least three occasions that I am aware of where there
has been hostile behavior . . . and that relates to Ms. Ahmed. Certainly,
the telephone conversation that was recorded and the court heard, there
were some indications that there was some aggression - expression and
some loud discussions, et cetera. Ms. Garcia had an encounter of
something similar two weeks ago . . . and then of course, . . . this last
Saturday's behavior just does not seem to have a rational explanation as
to the aggression or the hostile behavior that took place . . . .

 

 As far as other factors that the court has to look at is what is the
stability of the parents, and certainly there is disparity there. And not to
the fault of Ms. Ahmed, Ms. Ahmed has, I think in the Court's opinion,
tried to do the best that she can under the circumstances, and you are
to be commended for having finished law school . . . .

 

 The contact with the children has been minimal, and of course, this is
not the factor that the court is look [sic] at and saying, "Well, because
there has been minimal contact, Ms. Ahmed is going to be punished." 
Certainly not. Ms. Ahmed, you have had some difficult times throughout
your life after the divorce and where you were trying to get yourself
situated with law school, and perhaps you did not have the time or the
finances to spend as much time with your children as you could have. 
And so I am not looking at that - negatively against you.


 I have to look at what is in the best interest of the children. The
children, after my discussion with them in chambers are excellent
children, and both you and Dr. Rashid should be very proud . . . .

 

 Now, I don't want these children not to be seeing you. That is not the
intent of this court, and I am not going to do that. In fact, I want these
children to get to know you better. I want these children to get to be
with you. I want these children to get to know that Mom is not a bad
mom and that mom, despite the fact that she may have had some
difficulties, mom is going to do well and is going to have a good
relationship with them.


 I want that, but I also have to consider matters that were brought to the
attention of the court by the ad litem and the recommendations of the ad
litem. And based on that and based on the fact that the testimony that
has been brought to the court as of today does point out some concern,
I am going to make a ruling that custody will be modified from joint
managing to sole managing conservator.


 I am also going to order that you undergo a psychiatric evaluation,
and I am going to - following that evaluation - -and I am not going to
require that you pay for it either. I am going to have Dr. Rashid pay for
that evaluation, and then after that evaluation is done, then I want to
address it. And then I want to - after that evaluation is brought to the
Court and we have an opportunity to review it, I want to get you back on
track to start visiting these children in a supervised fashion . . . . There
should be no reason why you should not be able to have visitation with
the children at a specific location without having to worry that someone
that is there is going to be hearing what you are talking to with the
children, so you are going to be given some time to visit with the children
at a later time.

 

 But what I am going to say is that you need to get evaluated and then I
will address any other matters that need to be addressed to the Court as
soon as that comes through. Now, the sooner you get that done, the
better it will be for you and the better it will be for the children.


(Emphasis added).


 It is clear that the trial court did not intend to terminate Ahmed's visitation and
access. The court was obviously struggling, in light of these difficult and extreme
circumstances, to balance Ahmed's rights with the best interests of the children. 

III.


Legal Analysis


A. The Best Interest of the Child is the Primary Consideration. 

 In a motion to modify, the children's best interest is always the court's primary
consideration in determining the issues of conservatorship and possession of and
access to the child. Tex. Fam. Code Ann. § 153.002 (Vernon 2002); Lenz v. Lenz, 79
S.W.3d 10, 14 (Tex. 2002) (reiterating that best interest of child is primary
consideration). The question of conservatorship of a child is left to the trial court's
sound discretion when it sits as a trier of fact. Jenkins v. Jenkins, 16 S.W.3d 473,
477 (Tex. App.-El Paso 2000, no pet.). The trial court is in the best position to
"observe the demeanor and personalities of the witnesses and can 'feel' the forces,
powers and influences that cannot be discerned by merely reading the record." Id. 
 The Texas Supreme Court has compiled a set of nine non-exhaustive factors
when determining the best interest of a child. See Holley v. Adams, 544 S.W.2d 367,
372 (Tex. 1976). These factors include: 1) the desires of the child, 2) the emotional
and physical needs of the child now and in the future, 3) emotional and physical
danger to the child now and in the future, 4) parenting abilities of the parties seeking
custody, 5) programs available to assist these persons, 6) plans for the children by
parties seeking custody, 7) stability of the home or proposed placement, 8) acts or
omissions committed by the parent which may indicate that the existing parent-child
relationship is not a proper one and 9) any excuse for the acts or omissions committed
by the parent. Id.

 B. The trial court followed the proper standard. 

 The majority interprets the trial court's ruling as if it had completely denied
Ahmed all access and visitation, concluding that the trial court abused its discretion
because the record does not reflect the existence of "extreme" grounds sufficient to
support the trial court's purported termination of Ahmed's rights of access and
visitation. The trial court's oral pronouncements, however, show that the trial judge
did not terminate Ahmed's rights of access and visitation. Rather, the trial judge
temporarily suspended those rights until it reviewed Ahmed's court-ordered psychiatric
evaluation. Upon completion of the evaluation, Ahmed's visitation would resume and
get "back on track." This ruling was not a permanent denial of visitation and access. 

 While the general rule in Texas is that the right of a parent to visit with his or
her children placed in the custody of the other parent by the divorce decree will not
be completely denied except when there are extreme grounds to support the denial,
that rule does not apply to a temporary suspension of access and visitation. In Allison
v. Allison, 660 S.W.2d 134, 137 (Tex. App. - San Antonio 1983, no writ), the San
Antonio Court of Appeals specifically stated: "Since the trial court has ordered a
termination of the right of access, not merely a suspension, we must look carefully at
the record for evidence of 'extreme grounds' to support such termination." Allison,
660 S.W.2d at 137 (emphasis added). Because the trial court's ruling in this case 
was a temporary suspension of Ahmed's access and visitation, the general rule is
inapplicable. This case should have been reviewed under an abuse of discretion
standard, i.e., whether the trial court's decision to restrict Ahmed's access and
visitation was arbitrary or unreasonable. See Worford v. Stamper, 801 S.W.2d 108,
109 (Tex. 1990) (per curiam); Downer v. Aquamarine Operators, Inc., 701 S.W.2d
238, 241-42 (Tex. 1985). 

 From the evidence presented at trial, I would hold that the trial court did not
abuse its discretion in temporararily suspending Ahmed's visitation rights until the
court reviewed her court-ordered psychiatric evaluation. Ahmed does not complain
that the trial court erred by ordering her to have a psychiatric evaluation, and she does
not complain that one is unnecessary. Although she claimed her threat to kill the
children was not serious, my paramount concern is the best interest of the children. 
See Green v. Green, 850 S.W.2d 809, 812 (Tex. App. - El Paso 1993, no writ). I
agree with the trial court that the children's best interest is satisfied by not exposing
them to the danger of losing their lives at the hands of their mother. See Green, 850
S.W.2d at 812. (9)

C. The standard is not clear and convincing evidence as suggested by the 
 majority.


 The majority relies on three cases for the proposition that courts should respond
to verbal threats by denying visitation only when they are repeated, incessant and
accompanied by an extensive history of substance abuse, mental illness, or illegal
behavior. See In re C.M.B., 204 S.W.3d 886, 896 (Tex. App.-Dallas 2006, no pet.);
In re C.S.C., No. 02-06-00254-CV, 2006 WL 3438185 (Tex. App.-Fort Worth Nov.
30, 2006, no pet.) (mem. op.); Reyna v. Dept. of Family & Protective Srvs., No. 01-05-00985-CV, 2006 WL 1098805, (Tex. App.-Houston [1st Dist.] April 27, 2006,
no pet.). Each of these cases involve involuntary terminations of parent-child
relationships, not temporary denials of access. In those cases, because of the elevated
status of the parent-child relationship, the quantum of proof required was elevated
from a preponderance of the evidence standard to one requiring clear and convincing 
evidence. Santosky v. Kramer, 455 U.S. 745, 758-59 (1982). 

 This case, however, did not involve the termination of Ms. Ahmed's parental
rights. The trial court properly focused on the best interests of the children. Had the
majority applied the correct standard, the only result it could have reached was that
the trial court properly utilized its discretion. While I agree with the sanctity of the
parent-child relationship as illustrated in Santosky, Ahmed was never in danger of
permanently losing those rights in this proceeding. Based upon this record, it is likely
that the trial court believed the children were in danger of losing their legal rights, or
their lives, if it failed to intervene by requiring Ahmed to be evaluated. 

D. Ahmed's Conduct was Extreme.

 Regardless, the evidence presented showed that immediate access by Ms.
Ahmed would endanger both the physical health and emotional well-being of the
children. See Figueroa v. Figueroa, 580 S.W.2d 621, 623 (Tex. Civ. App.-El Paso
1979, no writ). The trial court heard the testimony of the witnesses, spoke to the
children, and elicited the assistance of the children's guardian ad litem to reach its
decision. The overwhelming evidence showed a history of a mother's serious lack of
interest in her children as well as incidents of erratic behavior, including the
acceptance of assistance from individuals whom Rashid believed sought to harm both
the children and him. Moreover, Ahmed's threat to kill herself and her own children
is the most telling and extremely disturbing evidence that the trial court heard. Clearly,
the court believed that this was an extreme circumstance requiring immediate and
decisive action. I cannot conceive of a circumstance where a death threat on a child
would not be considered endangerment. 

 As an appellate court, we are confronted with only a "cold" record. The words
spoken by Ahmed here are, indeed, chilling. If Texas law requires Rashid to prove
extreme grounds, I cannot agree that the trial court abused its discretion by finding
that the circumstances here were extreme.

IV.



 Injunctive Relief


 By issue three, Ahmed argues the trial court erred in granting Rashid a
permanent injunction against her. After the bench trial, the court stated, "I will enter
an order for Ms. Ahmed not to be carrying out any activities that would be interpreted
as a harassing manner." The court's written order stated that "[B]ecause of the
conduct of . . . [Ms. Ahmed] a permanent injunction against her should be granted. .
. ." The majority states that "[w]e believe that such an order is too indefinite to be
enforceable and that there is no evidence to support the injunction." Slip op. at 12. 
I disagree. 

 Texas recognizes a right to privacy which includes the right to be free from
willful intrusions into one's personal life at home and at work. Valenzuela v. Aquino,
763 S.W.2d 43, 45 (Tex. App.-Corpus Christi 1988, no writ). A person may obtain
injunctive relief to protect the right to be left alone from unwanted attention. Id.;
Kramer v. Downey, 680 S.W.2d 524, 525 (Tex. App.-Dallas 1984, writ ref'd n.r.e.). 
The decision to grant or deny a permanent injunction lies within the trial court's sound
discretion, and appellate review is restricted to whether the action involved a clear
abuse of discretion. Univ. Interscholastic League v. Buchanan, 848 S.W.2d 298, 301
(Tex. App.-Austin 1993, no writ); Hues v. Warren Petroleum Co., 814 S.W.2d 526,
529 (Tex. App.-Houston [14th Dist.] 1991, writ denied).

 By granting the permanent injunction, the trial court sought to protect the rights
of Dr. Rashid and his children to be free from unwanted attention and harassment. 
Based upon Dr. Rashid's testimony, I would hold that the trial court acted within its
discretion by granting permanent injunctive relief. I would overrule issue three.

V. 



 Discrepancy Between Oral Pronouncements & Written Judgment (10)



 In its written order, the trial court made the following findings and orders:

 The Court finds that the material allegations in the petition to
modify are true and that the requested modification is in the best interest
of the children . . . . IT IS ORDERED that the requested modification is
GRANTED.


* * * * *



 IT IS ORDERED that no visitation rights are given to Respondent
SAMEENA AHMED.


 This order does not preclude Respondent from seeking visitation
rights upon compliance with Orders of this Court, the laws of the State
of Texas and the United States.


 IT IS ORDERED that no access to the children be given to
Respondent SAMEENA AHMED.


 When the record reflects a clerical variance between the judgment announced
in open court and the judgment which the trial court eventually signed, an appellate
court can modify the judgment to correct the mistake. Keim v. Anderson, 943 S.W.2d
938, 946 (Tex. App.-El Paso 1997, no writ); McLendon v. McLendon, 847 S.W.2d
601, 611 (Tex. App.-Dallas 1992, writ denied); Catlett v. Catlett, 630 S.W.2d 478,
483 (Tex. App.-Fort Worth 1982, writ ref'd n.r.e.). In other words, an appellate court
can correct the entry of a final, written judgment that incorrectly states the judgment
actually rendered by the trial judge. Escobar v. Escobar, 711 S.W.2d 230, 231-32
(Tex. 1986). A judgment is rendered whenever the trial judge officially announces his
decision in open court in his official capacity for his official guidance whether orally or
by written memorandum. Samples Exterminators, v. Samples, 640 S.W.2d 873, 875
(Tex. 1982) (per curiam); Balogh v. Ramos, 978 S.W.2d 696, 700 (Tex. App.-Corpus
Christi 1998, pet. denied).

 I do not believe the orally rendered judgment showed the trial judge intended to
permanently terminate Ahmed's rights of access and visitation. However, the signed
written order may give this impression because it specifically denied her these rights
and allowed her to seek visitation only "upon compliance with Orders of this Court,
the laws of the State of Texas and the United States." Thus, the written order
incorrectly stated the orally rendered judgment because the written order: (1) did not
require Ms. Ahmed to undergo a psychiatric evaluation; and (2) did not mention that
pending the trial judge's review of the evaluation, he anticipated that Ahmed would 
start visiting the children in a supervised fashion. Accordingly, I would modify the
signed order by deleting the following language:

 IT IS ORDERED that no visitation rights are given to Respondent
SAMEENA AHMED.


 This order does not preclude Respondent from seeking visitation
rights upon compliance with Orders of this Court, the laws of the State
of Texas and the United States.


 IT IS ORDERED that no access to the children be given to
Respondent SAMEENA AHMED.


In place of the above language, I would substitute the following language:

 IT IS ORDERED that no visitation rights are given to Respondent
SAMEENA AHMED.


 IT IS ORDERED that no access to the children be given to
Respondent SAMEENA AHMED.


 IT IS ORDERED that Respondent SAMEENA AHMED undergo a
psychiatric evaluation.


 This order does not preclude Respondent SAMEENA AHMED from
resuming the right of access and supervised visitation upon the trial
court's review of the psychiatric evaluation.


See Tex. R. App. P. 43.2(b); McLendon, 847 S.W.2d at 611 (when clerical variance
existed between orally rendered judgment and recitations in final decree, appellate
court can modify decree by deleting recitations in decree and substituting language to
reflect orally rendered judgment).

VI. 


Conclusion


 Based on my review of the evidence presented at the hearing, I cannot agree
that the trial court abused its discretion by temporarily suspending Ms. Ahmed's
access and visitation until it reviewed her psychiatric evaluation. Further, the trial
court acted within its discretion by granting permanent injunctive relief. An abuse of
discretion does not occur as long as some evidence of a substantive and probative
character exists to support the trial court's decision. Holley, 864 S.W.2d at 706. 
There is ample evidence to support both the permanent injunction and the trial court's
temporary suspension of access and visitation. Accordingly, I would modify the trial
court's judgment, and as modified, I would affirm the judgment in its entirety.

 

 ROSE VELA

 Justice


Dissenting Memorandum Opinion delivered and 

filed this 1st day of November, 2007.
1. Although the record does not reflect when the parties were married, testimony reveals that the
children were born during the marriage and that the couple actually separated in 1996, and at that time
began living with Rashid. 
2. Even after Ahmed finished law school, she did not attempt to move closer to her children. 
Instead, she moved to the Virginia/Washington D.C. area and began working. After approximately six
months, she was terminated from her employment and moved back to Chicago.
3. The record also reflects other incidents of Ahmed's failure to visit the children. In May, 2005,
she was to have a supervised visit with the children at Mr. Gatti's Pizza Restaurant in McAllen. She did
not arrive until two hours after the scheduled time, and the children had, by that time, left the
restaurant.
4. Since the parties were divorced in Houston, the Houston trial court had continuing jurisdiction
over the children at the time of the motion for contempt. The Hidalgo County District Court
subsequently obtained jurisdiction over the children after the children moved to McAllen.
5. Ahmed testified that the reason she did not return the children to Rashid was that the children
told her Rashid's mother, who lived with Rashid and helped raise the children, physically abused them. 
A CPS investigation determined that the allegations were unsubstantiated.
6. The record reflects that both children are well-adjusted, A students, and are involved in
numerous extracurricular activities in McAllen.
7. Both children testified in chambers that they did not want to visit with their mother. M.S.R., 
the older child, wanted to testify in open court, but the trial court denied his request. At the time of
the hearing, the children were ages 13 and 9.
8. This conversation took place during the time in which Ahmed was refusing to return the
children to Rashid in the summer of 2003.
9. In Green, the evidence showed that the child's father spoke vulgarly to the child and that he
would "walk around in front of the child with nothing on but a T-shirt." Green, 850 S.W.2d at 812.
After hearing this evidence, the trial court concluded that (1) possession of and access to the child by
the father is not in the child's best interest, and (2) possession of and access to the child by the father
would endanger the child's physical and emotional welfare. Id. The trial court appointed the child's
mother as sole managing conservator and denied the father his visitation rights. Id. On appeal, the father
argued that the trial court erred in denying him visitation. Id. In affirming the trial court, the El Paso
Court of Appeals determined that (1) more than a scintilla of evidence existed to support the trial court's
findings; (2) the trial court's finding on the issues of possessory conservatorship and visitation were not
against the great weight and preponderance of the evidence; and (3) the trial court did not abuse its
discretion. Id. 
10. In footnote one, the majority, after noting the discrepancy between the oral pronouncements
and the judgments, states: "This discrepancy is significant because if the denial of access and visitation
rights was conditioned upon a [psychiatric] evaluation, then the trial court's order would be temporary,
and this court would lack jurisdiction." (citation omitted). The majority further states that "Following
the dissent's analysis, therefore, would require that we dismiss this case."

 In his oral pronouncements, the trial judge stated that after the psychiatric evaluation, he wanted
to resume visitation privileges on a supervised basis. Prior to this hearing, Ms. Ahmed had unsupervised,
rather than supervised visitation privileges. Therefore, the modification of visitation privileges from
unsupervised to supervised constitutes a permanent, and not a temporary, modification of the decree.