**Opinion filed August 13, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00033-CV

_____

## IN THE INTEREST OF D.S. AND D.J.U., CHILDREN

**On Appeal from the 323rd District Court**

**Tarrant County, Texas**

**Trial Court Cause No. 323-87554-J-08**

## M E M O R A N D U M   O P I N I O N

In this appeal, appellant A.W. contends the trial court erred in terminating her parental rights to her minor children D.S. and D.J.U. In doing so, she presents four issues for our determination. In the first three issues, she asserts the evidence was factually insufficient to show (1) that she knowingly placed or allowed the children to remain in conditions that endangered the physical or emotional well-being of the children, (2) that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and (3) that the termination of the parent-child relationship between herself and her sons was in her sons' best interest. In the fourth issue, she argues that TEX. FAM. CODE ANN. § 263.405(i) (Vernon 2008) violates the separation of powers provision of Article II, section 1 of the Texas Constitution. Disagreeing that reversible error exists, we affirm the judgment of the trial court.

In any consideration as to the validity of a termination of parental rights, a reviewing court must bear in mind that the natural right existing between a parent and child is of constitutional dimension and that a termination of that right interferes with a fundamental constitutional right. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). Consequently, termination proceedings should be strictly construed in favor of preserving the relationship. *Holick*, 685 S.W.2d at 20. Parental rights are so important that, for a trial court to terminate those rights, there must be clear and convincing evidence that establishes one statutory ground for the termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (Vernon 2008); *Holick*, 685 S.W.2d at 20. The "clear and convincing evidence" requirement is statutorily defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008).

In considering factual sufficiency, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). This means that we must look at the disputed evidence and determine if a reasonable factfinder could have resolved that evidence in favor of the finding. The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have reasonably formed a reasonable belief or conviction. *Id.* A proper application of this rather complicated mandate requires us to review the rather extensive evidence in some detail.

A.W. is the mother of D.C., D.W, De.S, D.S., and D.J.U. D.C. lives with A.W.'s mother, and A.W. voluntarily relinquished her rights to D.W. and De.S in a previous termination case. This case we are reviewing concerns the termination of A.W.'s parental rights to D.S. (originally A.W. did not remember his date of birth but, when prompted, agreed it was April 14, 2003) and D.J.U. (born March 19, 2007). Shortly before the trial, A.W. lost a sixth son when her pregnancy was terminated at five months.

At the time of the October 2008 trial, A.W. said that she was currently living at the Budget Suites in Tarrant County with R.M. and that she had lived with him off and on for about three years. She had been employed as a topless dancer. She admitted that W.S. (the father of D.S. and De.S.) was a registered sex offender as was the father of D.J.U. and the father of D.C.

2

A.W. lived with W.S. for a period of three and one-half years. During that period, he had physically abused her. He had also had unsupervised contact with A.W.'s children, three of whom had made an outcry of physical abuse against him. In 2005, W.S. left with D.S, went to Michigan, and had the boy in his care until January 2006. Although A.W. went to Michigan for a week in an effort to get D.S. back, W.S. would not give possession of the child to A.W. He did promise to return D.S. when the summer was over, but he did not do so. A.W. also admitted that W.S. was a drug addict who left D.S. with "whomever" and that, on the telephone, he would tell her that D.S. was in "random" places. This concerned her, but she never really did anything about the situation. She testified that, when D.S. was finally returned to her, he was violent, sexually active, skinny, and bruised and "stunk like urine."

The father of D.J.U. had been incarcerated in the Texas Department of Criminal Justice since 2006 after his parole for indecency with a child was revoked. A.W. denied ever actually living with D.J.U.'s father and denied that he ever told her he was a sex offender. She also denied that she conceived D.J.U. after learning that J.U. was a sex offender. CASA worker Toni Taylor voiced concerns to A.W. about the safety of the children around J.U. because he was a convicted sex offender, but A.W. said that she did not bring the boys around him and that she wanted the worker to meet J.U.

In October 2006, A.W. met R.M. at a Wal-Mart store, began a relationship with him, and had been "[p]retty much" with him since that time. R.M. had a felony drug possession conviction for which he was on probation during at least part of the time period with which this case is concerned. In September 2007 and in the summer of 2008, the Department of Family and Protective Services (the Department) investigated referrals for domestic violence between R.M. and A.W.

On December 1, 2007, when D.S. was four years old and D.J.U. was about nine months old, A.W. found D.S. under the covers in D.J.U.'s crib straddling D.J.U. face to face. The baby was naked, and D.S. had his clothes on. A.W. admitted that she thought D.S. was trying to have some kind of sexual contact with D.J.U. and that he was "experimenting." She spanked D.S. and did nothing further until she sought help through Catholic Charities later in the month.

Pursuant to a recommendation from Catholic Charities, A.W. took D.S. to Cook Children's Medical Center who transferred the child to a Dallas residential treatment center. However, because she thought he was being mistreated, A.W. removed the boy from that facility shortly thereafter.

Inasmuch as that removal was against the medical advice of the center and because of a concern about D.S. trying to have sex with D.J.U., the Department received a referral from the center accusing A.W. of neglectful supervision and medical neglect. Noting these concerns, the Department set up a safety plan for R.M.'s mother to take D.S., for D.J.U. to stay with A.W., and for A.W. to follow through with a mental health evaluation and treatment for D.S.

On January 2, 2008, R.M.'s mother placed D.S. in a psychiatric hospital. The evidence showed that, while there, he played out sexual games that allegedly had occurred between him and A.W. While in the hospital's dayroom, he licked a teddy bear's crotch area and told a staff member that A.W. would suck his "pee-pee," that it hurt, that he would lick A.W.'s "woo-woo," and that R.M. would stick his "big pee-pee" in D.S.'s mouth.

In light of this testimony, another referral was made to the Department that resulted in its conclusion that A.W. had sexually abused and neglectfully supervised both D.S. and D.J.U. and that R.M. had sexually abused D.S. Because of these conclusions, the Department took custody of both D.S and D.J.U. on January 10, 2008. At that time, D.J.U. was nine months of age, was underweight, and had strep throat, an ear infection, and a temperature of 103 degrees. A.W. denied that the child was underweight at the time and opined that he was chubby. She admitted that she was aware that D.J.U. may have missed some of his shots but said that the child had shots in the hospital when he was born and another set at his six-week checkup. A.W. averred that she did not know where to get the shots and that she did not have a regular pediatrician. She opined that it was not important for her children to get the shots because they got violently sick afterward. She also denied that D.J.U. was ever sick while in her care. She said that she was in a position to take care of D.J.U. and that she could handle him "just fine."

The Department immediately placed D.J.U. in a foster home, while D.S remained in the psychiatric hospital until he was placed at the All Church Home for Children, a residential treatment center for children with emotional issues. Parenthetically, the Department asserts that no suitable suggestion for relative placement was provided by any of the parents of the children.

The record reveals testimony that, from the time D.S. was moved to the All Church Home for Children, he acted out sexually, had no personal social skills or boundaries, and was physically and verbally abusive toward both children and adults. Therapy testimony was that D.S. acted out sexual abuse, displayed anxiety, and was hypervigilant.

4

A.W. testified that she and R.M. were no longer together. She said that she had worked at a dance club the night before the trial but, prior to that time, had not worked for two to two and one-half months due to her pregnancy. She denied that R.M. was currently on probation, although she acknowledged that he had been so in the past.

The Department testimony was that, throughout the pendency of the case, the Department notified A.W. of the requirements of her service plan and maintained contact with her. The service plan required weekly visits with D.J.U., individual counseling, a psychological evaluation and follow through with any recommendations made, random drug tests, parenting classes, proof of appropriate housing, and gainful employment. The plan was similar to one she had been given a couple of years before. Because of A.W.'s limited compliance with the service plan, the Department advised her that it intended to seek termination of her parental rights if she did not follow the plan more closely. She did not do so. Moreover, D.S. had psychological problems beyond that which A.W. could handle. Based upon this, it was the Department's recommendation that he not be returned to A.W. but remain in a facility like the All Church Home for Children where he could receive the treatment he needed. D.J.U. was doing well in foster care and had thrived there, and the Department felt it was in the best interest of D.J.U. that he remain there.

By virtue of Section 161.001(1)(D), a trial court may order termination of an individual's parent-child relationship if it finds by clear and convincing evidence that the person has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the emotional or physical well-being of the child. Under that subsection, we are required to examine evidence related to the environment of the child to determine if that environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). The phrase "conditions or surroundings" refers only to the acceptability of the child's living conditions and does not concern the parent's conduct toward the child. *In re D.J.J.*, 178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.).

Thus, the Department must show that the children's living conditions pose a real threat of injury or harm. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Although it is not required that the parent have certain knowledge that an actual injury is occurring, there must be evidence that the parent was aware of the potential for danger to the child and disregarded that risk. *Id.*

Conduct of a parent or another person in the home can create an environment that endangers the physical or emotional well-being of a child under subsection D. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). Thus, inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate in the home on a regular basis is a part of the "conditions or surroundings" of the child's home under Section 161.001(1)(D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

Section 161.001(1)(E) authorizes a trial court to terminate a parent-child relationship if it finds clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Although "endanger" means more than a mere threat of metaphysical injury or the possible ill effects of a less than perfect family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Rather, "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment may be established through actions and omissions. *In re J.I.T.P.*, 99 S.W.3d 841, 844 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Under subsection (E), the cause of endangerment must be the parent's conduct, as evidenced not only by the parent's acts but also by the parent's omission. *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied).

Our careful review of all the evidence, pertinent portions of which we have set out, convinces us that it is amply sufficient, factually, to sustain the trial court's finding that A.W. had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and also engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. It is also sufficient to sustain the trial court's conclusion that the termination of A.W.'s parental rights was in the best interest of the children.

Accordingly, because they do not reveal error, we overrule A.W.'s first three issues presented for our review. In A.W.'s fourth issue, she argues that, in the event the Department presented an argument of waiver based upon Section 263.405(i), that provision violates the

separation of powers provision of Article II, section 1 of the Texas Constitution. However, the Department has not presented any such argument, and A.W.'s fourth issue is summarily overruled.

Inasmuch as we have overruled all of A.W.'s issues, the judgment of the trial court must be, and is hereby, affirmed.[1]


                                        JOHN T. BOYD
                                        SENIOR JUSTICE


August 13, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Boyd, S.J.[2]

---

[1]Although the trial judge in this matter and the undersigned have the same last name, they are not in any way related.

[2]John T. Boyd, Retired Chief Justice, Court of Appeals, 7th District of Texas at Amarillo, sitting by assignment.