Opinion filed August 13, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed August 13,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-09-00033-CV

                                                       ________

 

                    IN THE
INTEREST OF D.S. AND D.J.U., CHILDREN

 



 

                                         On
Appeal from the 323rd District Court

 

                                                         Tarrant
County, Texas

 

                                           Trial
Court Cause No. 323-87554-J-08

 



 

                                             M
E M O R A N D U M   O P I N I O N

In
this appeal, appellant A.W. contends the trial court erred in terminating her
parental rights to her minor children D.S. and D.J.U.  In doing so, she
presents four issues for our determination.  In the first three issues, she
asserts the evidence was factually insufficient to show (1) that she knowingly
placed or allowed the children to remain in conditions that endangered the
physical or emotional well-being of the children, (2) that she engaged in
conduct or knowingly placed the children with persons who engaged in conduct
that endangered the physical or emotional well-being of the children, and (3)
that the termination of the parent-child relationship between herself and her
sons was in her sons=
best interest.  In the fourth issue, she argues that Tex. Fam. Code Ann. ' 263.405(i)
(Vernon 2008) violates the separation of powers provision of Article II,
section 1 of the Texas Constitution.  Disagreeing that reversible error
exists, we affirm the judgment of the trial court.








In
any consideration as to the validity of a termination of parental rights, a
reviewing court must bear in mind that the natural right existing between a
parent and child is of constitutional dimension and that a termination of that
right interferes with a fundamental constitutional right.  Holick v.
Smith, 685 S.W.2d 18, 20 (Tex. 1985); In re G.M., 596 S.W.2d 846,
847 (Tex. 1980). Consequently, termination proceedings should be strictly
construed in favor of preserving the relationship.  Holick, 685 S.W.2d
at 20.  Parental rights are so important that, for a trial court to terminate
those rights, there must be clear and convincing evidence that establishes one
statutory ground for the termination and that termination is in the child=s best interest.  Tex. Fam. Code Ann. ' 161.001 (Vernon 2008); Holick,
685 S.W.2d at 20.  The Aclear
and convincing evidence@
requirement is statutorily defined as Athe
measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.@  Tex. Fam. Code Ann. ' 101.007 (Vernon 2008).

In
considering factual sufficiency, we must give Adue
consideration@ to any
evidence the factfinder could reasonably have found to be clear and
convincing.  In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002).  This means
that we must look at the disputed evidence and determine if a reasonable
factfinder could have resolved that evidence in favor of the finding.  The
evidence is factually insufficient if, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that the factfinder could not have reasonably
formed a reasonable belief or conviction.  Id.  A proper application of
this rather complicated mandate requires us to review the rather extensive
evidence in some detail.

A.W.
is the mother of D.C., D.W, De.S, D.S., and D.J.U.  D.C. lives with A.W.=s mother, and A.W.
voluntarily relinquished her rights to D.W. and De.S in a previous termination
case.  This case we are reviewing concerns the termination of A.W.=s parental rights to D.S.
(originally A.W. did not remember his date of birth but, when prompted, agreed
it was April 14, 2003) and D.J.U. (born March 19, 2007).  Shortly before the
trial, A.W. lost a sixth son when her pregnancy was terminated at five months.

At
the time of the October 2008 trial, A.W. said that she was currently living at
the Budget Suites in Tarrant County with R.M. and that she had lived with him
off and on for about three years.  She had been employed as a topless dancer. 
She admitted that W.S. (the father of D.S. and De.S.) was a registered sex
offender as was the father of D.J.U. and the father of D.C.








A.W.
lived with W.S. for a period of three and one-half years.  During that period,
he had physically abused her.  He had also had unsupervised contact with A.W.=s children, three of whom
had made an outcry of physical abuse against him.  In 2005, W.S. left with D.S,
went to Michigan, and had the boy in his care until January 2006.  Although
A.W. went to Michigan for a week in an effort to get D.S. back, W.S. would not
give possession of the child to A.W.  He did promise to return D.S. when the
summer was over, but he did not do so.  A.W. also admitted that W.S. was a drug
addict who left D.S. with Awhomever@ and that, on the
telephone, he would tell her that D.S. was in Arandom@ places.  This concerned
her, but she never really did anything about the situation.  She testified
that, when D.S. was finally returned to her, he was violent, sexually active,
skinny, and bruised and Astunk
like urine.@

The
father of D.J.U. had been incarcerated in the Texas Department of Criminal
Justice since 2006 after his parole for indecency with a child was revoked. 
A.W. denied ever actually living with D.J.U.=s
father and denied that he ever told her he was a sex offender.  She also denied
that she conceived D.J.U. after learning that J.U. was a sex offender.  CASA
worker Toni Taylor voiced concerns to A.W. about the safety of the children around
J.U. because he was a convicted sex offender, but A.W. said that she did not
bring the boys around him and that she wanted the worker to meet J.U.

In
October 2006, A.W. met R.M. at a Wal-Mart store, began a relationship with him,
and had been A[p]retty
much@ with him since
that time.  R.M. had a felony drug possession conviction for which he was on
probation during at least part of the time period with which this case is
concerned.  In September 2007 and in the summer of 2008, the Department of
Family and Protective Services (the Department) investigated referrals for
domestic violence between R.M. and A.W.

On
December 1, 2007,  when D.S. was four years old and D.J.U. was about nine
months old, A.W. found D.S. under the covers in D.J.U.=s crib straddling D.J.U. face to face.  The
baby was naked, and D.S. had his clothes on.  A.W. admitted that she thought
D.S. was trying to have some kind of sexual contact with D.J.U. and that he was
Aexperimenting.@  She spanked D.S. and did
nothing further until she sought help through Catholic Charities later in the
month.








Pursuant
to a recommendation from Catholic Charities, A.W. took D.S. to Cook Children=s Medical Center who
transferred the child to a Dallas residential treatment center.  However,
because she thought he was being mistreated, A.W. removed the boy from that
facility shortly thereafter.  Inasmuch as that removal was against the medical
advice of the center and because of a concern about D.S. trying to have sex
with D.J.U., the Department received a referral from the center accusing A.W.
of neglectful supervision and medical neglect.  Noting these concerns, the
Department set up a safety plan for R.M.=s
mother to take D.S., for D.J.U. to stay with A.W., and for A.W. to follow
through with a mental health evaluation and treatment for D.S.

On
January 2, 2008, R.M.=s
mother placed D.S. in a psychiatric hospital.  The evidence showed that, while
there, he played out sexual games that allegedly had occurred between him and
A.W.  While in the hospital=s
dayroom, he licked a teddy bear=s
crotch area and told a staff member that A.W. would suck his Apee-pee,@ that it hurt, that he
would lick A.W.=s Awoo-woo,@ and that R.M. would stick
his Abig pee-pee@ in D.S.=s mouth.

In
light of this testimony, another referral was made to the Department that
resulted in its conclusion that A.W. had sexually abused and neglectfully
supervised both D.S. and D.J.U. and that R.M. had sexually abused D.S.  Because
of these conclusions, the Department took custody of both D.S and D.J.U. on
January 10, 2008.  At that time, D.J.U. was nine months of age, was
underweight, and had strep throat, an ear infection, and a temperature of 103
degrees.  A.W. denied that the child was underweight at the time and opined
that he was chubby.  She admitted that she was aware that D.J.U. may have
missed some of his shots but said that the child had shots in the hospital when
he was born and another set at his six-week checkup.  A.W. averred that she did
not know where to get the shots and that she did not have a regular
pediatrician. She opined that it was not important for her children to get the
shots because they got violently sick afterward.  She also denied that D.J.U.
was ever sick while in her care.  She said that she was in a position to take
care of D.J.U. and that she could handle him Ajust
fine.@

 The
Department immediately placed D.J.U. in a foster home, while D.S remained in
the psychiatric hospital until he was placed at the All Church Home for
Children, a residential treatment center for children with emotional issues. 
Parenthetically, the Department asserts that no suitable suggestion for
relative placement was provided by any of the parents of the children.

The
record reveals testimony that, from the time D.S. was moved to the All Church
Home for Children, he acted out sexually, had no personal social skills or
boundaries, and was physically and verbally abusive toward both children and
adults.  Therapy testimony was that D.S. acted out sexual abuse, displayed
anxiety, and was hypervigilant.








A.W.
testified that she and R.M. were no longer together.  She said that she had
worked at a dance club the night before the trial but, prior to that time, had
not worked for two to two and one-half months due to her pregnancy.  She denied
that R.M. was currently on probation, although she acknowledged that he had
been so in the past.

The
Department testimony was that, throughout the pendency of the case, the
Department notified A.W. of the requirements of her service plan and maintained
contact with her.  The service plan required weekly visits with D.J.U.,
individual counseling, a psychological evaluation and follow through with any
recommendations made, random drug tests, parenting classes, proof of
appropriate housing, and gainful employment.  The plan was similar to one she
had been given a couple of years before.  Because of A.W.=s limited compliance with
the service plan, the Department advised her that it intended to seek
termination of her parental rights if she did not follow the plan more
closely.  She did not do so.  Moreover, D.S. had psychological problems beyond
that which A.W. could handle.  Based upon this, it was the Department=s recommendation that he
not be returned to A.W. but remain in a facility like the All Church Home for
Children where he could receive the treatment he needed.  D.J.U. was doing well
in foster care and had thrived there, and the Department felt it was in the
best interest of D.J.U. that he remain there.

By
virtue of Section 161.001(1)(D), a trial court may order termination of an
individual=s
parent-child relationship if it finds by clear and convincing evidence that the
person has knowingly placed or knowingly allowed the child to remain in
conditions or surroundings that endanger the emotional or physical well-being
of the child.  Under that subsection, we are required to examine evidence
related to the environment of the child to determine if that environment was
the source of endangerment to the child=s
physical or emotional well-being.  In re D.T., 34 S.W.3d 625, 632 (Tex.
App.CFort Worth 2000,
pet. denied).  The phrase Aconditions
or surroundings@
refers only to the acceptability of the child=s
living conditions and does not concern the parent=s
conduct toward the child.  In re D.J.J., 178 S.W.3d 424, 429 (Tex. App.CFort Worth 2005, no pet.).

Thus,
the Department must show that the children=s
living conditions pose a real threat of injury or harm.  In re C.L.C.,
119 S.W.3d 382, 392 (Tex. App.CTyler
2003, no pet.).  Although it is not required that the parent have certain
knowledge that an actual injury is occurring, there must be evidence that the
parent was aware of the potential for danger to the child and disregarded that
risk.  Id.








Conduct
of a parent or another person in the home can create an environment that
endangers the physical or emotional well-being of a child under subsection D.  In
re W.S., 899 S.W.2d 772, 776 (Tex. App.CFort
Worth 1995, no writ).  Thus, inappropriate, abusive, or unlawful conduct by
persons who live in the child=s
home or with whom the child is compelled to associate in the home on a regular
basis is a part of the Aconditions
or surroundings@ of
the child=s home under
Section 161.001(1)(D).  In re M.R.J.M., 280 S.W.3d 494, 502 (Tex.
App.CFort Worth 2009,
no pet.).

Section
161.001(1)(E) authorizes a trial court to terminate a parent-child relationship
if it finds clear and convincing evidence that the parent engaged in conduct or
knowingly placed the child with persons who engaged in conduct that endangers
the physical or emotional well-being of the child.  Although Aendanger@ means more than a mere
threat of metaphysical injury or the possible ill effects of a less than
perfect family environment, it is not necessary that the conduct be directed at
the child or that the child actually suffer injury.  Rather, Aendanger@ means to expose the child
to loss or injury or to jeopardize the child=s
emotional or physical health.  Tex. Dep=t of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987).  Endangerment may be established through actions and
omissions.  In re J.I.T.P., 99 S.W.3d 841, 844 (Tex. App.CHouston [14th Dist.] 2003,
no pet.). Under subsection (E), the cause of endangerment must be the
parent=s conduct, as
evidenced not only by the parent=s
acts but also by the parent=s
omission.  In re C.M.B., 204 S.W.3d 886, 895 (Tex. App.CDallas 2006, pet. denied).

Our
careful review of all the evidence, pertinent portions of which we have set
out, convinces us that it is amply sufficient, factually, to sustain the trial
court=s finding that
A.W. had knowingly placed or knowingly allowed the children to remain in
conditions or surroundings that endangered their physical or emotional
well-being and also engaged in conduct or knowingly placed the children with
persons who engaged in conduct that endangered their physical or emotional
well-being.  It is also sufficient to sustain the trial court=s conclusion that the
termination of A.W.=s
parental rights was in the best interest of the children.








 Accordingly,
because they do not reveal error, we overrule A.W.=s first three issues presented for our
review.  In A.W.=s
fourth issue, she argues that, in the event the Department presented an
argument of waiver based upon Section 263.405(i), that provision violates the
separation of powers provision of Article II, section 1 of the Texas
Constitution.  However, the Department has not presented any such argument, and
A.W.=s fourth issue is
summarily overruled.

Inasmuch
as we have overruled all of A.W.=s
issues, the judgment of the trial court must be, and is hereby, affirmed.[1]

 

 

JOHN T. BOYD

SENIOR JUSTICE

 

August 13, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Boyd, S.J.[2]









[1]Although the trial judge in this matter and the
undersigned have the same last name, they are not in any way related.





[2]John T. Boyd, Retired Chief Justice, Court of Appeals,
7th District of Texas at Amarillo, sitting by assignment.