**In re C.M.B.**

No. 05–04–01117–CV.

Court of Appeals of Texas, Dallas.

Oct. 27, 2006.

---

55. *See* Tex.Code Crim. Proc. Ann. arts. 38.14, 38.141 (Vernon 2005).

56. *See* Tex.R.App. P. 43.2(c), 43.3.

Eugene S. Bem, Dallas, pro se.

Gaylynn Gee, Law Office of Gaylynn Gee, Dallas, for Appellant.

Barbara Joanne Van Duyne, Raggio & Raggio PLLC, Georganna L. Simpson, Law Offices of Georganna L. Simpson, Dallas, for Appellee.

Before Justices MOSELEY, BRIDGES, and LANG–MIERS.

## OPINION

Opinion by Justice BRIDGES.

Joelle Florence Bem appeals the trial court's judgment terminating her parental rights to her daughter, C.M.B.[1] In two issues appellant argues[2] there was factually insufficient evidence to support the termination of the parent-child relationship between her and her child, and the trial court erred in finding termination was in C.M.B.'s best interest. We affirm the trial court's judgment.

Joelle Florence Bem ("Mother") is the mother of one Child, C.M.B. C.M.B. was born on August 18, 2000 in Florida. Eugene S. Bem ("Father") is the father of C.M.B. Parents were married on September 30, 2000. In April 2002, Father filed for a divorce against Mother, and C.M.B.'s grandparents intervened into the divorce action seeking appointment as non-parent sole managing conservators ("SMCs"). After hearing the accusations of various behaviors of violence and substance abuse by the parents, the trial court appointed Grandparents temporary SMCs of C.M.B. The following day, Grandparents filed an Original Petition in Suit Affecting the Parent–Child Relationship seeking the same

---

1. Eugene Bem, C.M.B.'s father, also had his parental rights terminated on July 26, 2004. Although he filed an amicus brief, he is not part of this appeal.

2. In her original brief, appellant raised two issues concerning her Pauper's Status and requested appointment of a new attorney to represent her on appeal. By this Court's order dated January 13, 2005, Mother received a new appointed attorney, and counsel filed a brief on November 14, 2005.

relief granted on a temporary basis by the trial court. A bench trial was held on March 15, 2004. On July 26, 2004, the trial court signed an order terminating Mother's and Father's parental rights to C.M.B. and appointing the Grandparents permanent Joint Managing Conservators. This appeal followed.

## Mother's Psychiatric History

Prior to the birth of C.M.B, Mother had obtained psychiatric assistance while attending college at Southern Methodist University. In 1992, Mother was diagnosed with a depressive disorder. In October 1999, Mother obtained emergency treatment at Presbyterian Hospital of Dallas where she complained of an anxiety and panic attack after admittedly drinking, using cocaine, and taking ecstasy. Mother was diagnosed with depressive disorder, polysubstance abuse, and personality disorders.

Less than ten months later, on August 18, 2000, Mother was admitted to a hospital in Florida for the birth of C.M.B. During her admission, Mother denied any prior drug use. Mother was hospitalized on three other occasions while residing in Florida. Beginning when C.M.B. was approximately two months old, Mother was admitted to the hospital for cocaine abuse and a possible drug overdose. Mother complained of post-partum depression and admitted to self-medicating and prior cocaine use.

For the first eight months of C.M.B.'s life, Sonia Cambra was C.M.B.'s nanny and took care of all of her needs six days a week. Prior to C.M.B.'s arrival home from the hospital, Father took the nanny shopping for necessary basic baby supplies, formula, and diapers. The nanny dressed, bathed, diapered, fed, and slept with C.M.B. during this time. Mother slept most of the day. When Mother would come home after being out, she would ask about the cat but not the baby.

The nanny frequently observed Mother drinking, and was aware of Mother's drug use. On one occasion when C.M.B. was only three weeks old, the nanny found a white powdery substance on a tray with a small knife on the nightstand. Subsequently that same day, the nanny had a discussion with Father and admonished him for giving Mother money for drugs. Further, Mother had previously told the nanny she would flush things in the toilet if the police came. On the nanny's one day off, she would not leave C.M.B. with Mother but would only leave C.M.B. with Father.

On one occasion while Parents resided in Florida, Mother fabricated a story of killing both the nanny and C.M.B. Father called police. The nanny testified that police woke her at 4:00 a.m. on March 29, 2001 to investigate the well-being of her and C.M.B after a report that Mother had shot and killed them both. The nanny showed the police where she had shoved the gun into a mattress the previous day upon Father's request. The police report indicated that both the nanny and C.M.B. were unharmed.

On April 24, 2001, when C.M.B. was approximately eight months old, Mother was again admitted to the hospital. Hospital records showed that Mother had active suicidal ideations and auditory hallucinations; had attempted suicide within the previous five weeks; and was coping with depression by self-medicating with Valium. Mother was diagnosed with adjustment disorder and anxiety. Further, Mother requested an abortion of her seven week

pregnancy that was denied due to concerns over her mental capacity. Mother miscarried shortly thereafter.

On September 9, 2001, when C.M.B. was approximately thirteen months old, Mother was involuntarily admitted to a hospital after she threatened to cut her wrists and jump off the seventeenth floor of a building. At Father's request, the police transported Mother to the hospital where she was admitted to the psychiatric unit. Mother was diagnosed with bipolar disorder, depression with auditory hallucinations, and possible problems with cocaine abuse.

Later in September 2001, Parents relocated to Texas. On September 30, 2001, police were called to Grandparents' house due to the fighting between Parents. At Father's request, the police transported Mother to North Central Medical Center in McKinney, Texas. Father was concerned about Mother because of her prior threats to harm C.M.B. as well as her behavior at the time. Further outpatient treatment at Green Oaks was recommended by hospital staff. However, Mother did not seek additional treatment at that time.

In Spring 2002, Father expressed his concern for Mother to both his mother, Louise Bem, and Grandparents. Specifically, Father sent a letter to Grandparents addressing both his previous and present concerns over Mother's threats to harm both herself and the baby. Father referenced specific incidences of violence and suicide attempts.

In May 2002, Mother sought treatment with Dr. Anthony Moore, a psychiatrist. Mother consistently received treatment and medication from Moore. Moore diagnosed Mother as Bipolar II with a borderline personality characterized by her wrist cutting, hostile outbreaks, and paranoia. Although he believed Mother was making progress and that her urine and hair drug screening tests were negative at that time, Moore expressed concerns over Mother's level of stress, additional stress of caring for a three year old, and Mother's truthfulness and cooperation in providing prior psychiatric treatment and employment information.

## Mother's Psychiatric Evaluations

Prior to the bench trial in District Court, the court ordered a social study and psychiatric evaluation of Mother. Dr. Alfredo Tamez conducted the social study, and Dr. Don Lammers conducted the psychiatric evaluation. Additionally, Mother retained Dr. Benjamin Albritton to conduct an independent evaluation. All three experts expressed some concern with Mother's behavior. All evaluations and family social studies were completed in 2002. Grandparents obtained copies of the medical records in January 2003 while preparing for trial. None of the experts including Moore were aware of Mother's full history and mental issues until medical records were provided by the Grandparents.

Dr. Tamez, the court-appointed social worker, testified that Mother did not disclose her past mental history and issues except for post-partum depression; did not disclose prior drug problems; did not disclose prior domestic abuse issues with Father; failed to provide requested medical and hospital records; and did not comply with his request for all parties to be evaluated by the Greater Dallas Counsel on Alcohol and Drug Abuse. Further, Tamez expressed concern over difficulties with ongoing supervised visitation due to the actions of Parents.

Dr. Lammers, the court-appointed psychiatrist, concluded in his evaluation report that Mother had significant psychological problems and evidence of a personality disorder consistent with bipolar disease. Further, he was concerned with the increased stress to Mother of caring for a small child and additional stress if Father withdrew financial support. He expressed concern that Parents' continual problems with each of the supervisors selected for visitation would override Parents' choice to see C.M.B. Additionally, he could not recommend C.M.B. be returned to Parents but believed that the Grandparents could provide a safe, stable environment for C.M.B.

Dr. Albritton testified that Mother was currently suffering from symptoms that were compatible with Bipolar II illness. Despite taking five prescription medications and more than two years of treatment by Moore, Mother was still somewhat unstable, fragile, and prone to relapse. Albritton described Mother's appearance as unkempt and hygiene marginally adequate during his interviews. He expressed concern that Mother claimed improved self-confidence with men as a result of dancing at a gentlemen's club as a topless dancer and that a person with a history of drug use would voluntarily expose herself to an environment such as a club known for containing available drugs. Further, if he had known the extent of her mental history, which she did not completely admit until Grandparents provided hospital records, he would have questioned her truth telling ability.

## History of Violence

Parents have a history of family violence against each other, against the Grandparents, and against third parties. Violence occurred both within and outside C.M.B.'s presence. On numerous occasions since the birth of C.M.B., the police have been called to intervene. Violence and threats against the Grandparents resulted in the trial court granting temporary restraining orders in 2002.

Parents have been involved in physical and verbal fights in front of C.M.B. Family members and C.M.B.'s nanny testified to witnessing numerous occasions of family violence between the Parents. In 2000, there were ten incidences of violence between the Parents witnessed by third parties. During the first eight months of C.M.B.'s life, the police were called to the residence on several occasions. On at least one occasion during that time, Mother's suicidal and violent behavior resulted in the police transporting her to the hospital.

In a letter faxed to Grandparents on April 12, 2002, Father recounted episodes of previous violence to Grandparents. On April 21, 2002, Father called Grandparents from Pennsylvania after Mother allegedly called and told him she would abandon C.M.B. and kill herself. Grandparents called police. The police reported Mother and C.M.B. were unharmed.

Parents have threatened Grandparents, and the trial court issued restraining orders against Parents. While residing with Grandparents in November 2001 and due to ongoing concerns of violence, Grandparents searched and found a gun in Parents' room. During an incident at the Stoneleigh Hotel on March 8, 2002, Parents were physically and verbally fighting in the lobby of the hotel with C.M.B. between them. When Grandparents attempted to intervene prior to the arrival of the police, Father threatened to harm Grandparents

as well as Mother. Further, in October 2002, Parents violated a restraining order, arrived at Grandparents home, and demanded to see C.M.B

### History of Abuse or Neglect of C.M.B.

Mother has emotionally abused or neglected C.M.B. Mother did not provide general care or properly supervise C.M.B. Numerous family members have expressed concern for C.M.B.'s health and safety when left with Mother.

For the first eight months of C.M.B.'s life, the nanny took care of all of her needs six days a week while Mother slept or was absent from the house. Two weeks after C.M.B. was born, Parents took a trip to New York and left C.M.B. with nanny. A month after C.M.B was born, Parents took a trip to Jamaica and left C.M.B. with nanny. When C.M.B. was three months old, Parents went to Paris and left C.M.B. with nanny. The nanny dressed, bathed, diapered, fed, and slept with C.M.B. during this time. In September 2000, the Grandparents came to visit the Parents in Florida. The nanny cared for C.M.B. in her room during the entire length of Grandparents visit. Further, during the visit, the Parents were frequently absent from the house.

Family members, including two of Mother's sisters and the Grandparents, testified to observing Mother transporting C.M.B. with no car safety seat; leaving C.M.B. alone in the bathtub; leaving C.M.B. alone on a step stairway; giving C.M.B. wine to drink; allowing and encouraging C.M.B to eat cat food; leaving prescriptions in the bathroom under the sink where they were accessible to C.M.B.; and engaging in violent verbal and physical fights not only in front of C.M.B. but also with C.M.B. in Mother's arms.

Mother admitted to using marijuana, alcohol, and cocaine before and after the birth of C.M.B. Family members, including Jennifer and Michelle, also witnessed Mother drinking and using cocaine after the birth of C.M.B. In addition to family members witnessing Mother's behavior, Michelle testified to caring for C.M.B. on several occasions when Mother was extremely intoxicated and not able to care for C.M.B.

Mother would involve C.M.B. in physical altercations between her and Father. On several different occasions and while holding C.M.B., Mother would yell at Grandparents and Father directly into C.M.B.'s ear. C.M.B. would cry and scream afterwards. During the three month period that Parents lived with Grandparents, Grandfather observed this behavior on five or six occasions.

At the time Parents moved to Texas C.M.B. was behind on her immunizations and developmentally delayed. Mother blames the nanny for not taking C.M.B. for her immunizations while they lived in Florida and Grandmother for not taking C.M.B. when they moved to Texas. C.M.B.'s last visit to the pediatrician in Florida was in September 2001. C.M.B. was updated on all immunizations by Allen Pediatrics on May 3, 2002 when taken by her Grandmother.

Grandparents took C.M.B. to Dr. Ava Stanczak at Allen Pediatrics in Allen, Texas on May 3, 2002. C.M.B. was in their temporary care and was twenty months old. Grandparents were concerned because C.M.B. was not speaking. Stanczak diagnosed C.M.B. with severe speech delay, possible hearing loss, and behavioral problems probably secondary to her environment and psychological situation. At the time of the social study in December

2002, Stanczak remained C.M.B.'s pediatrician. Grandmother stated in the social study that C.M.B. received speech therapy twice a week. Additional testing was conducted by Dr. Rila. Rila administered the Vineland Adaptive Behavior Scales when C.M.B. was approximately three-and-one half years old. Results of the test showed C.M.B. had the expressive communication age equivalent of a two year old.

Grandmother and Mother's sister and aunt testified that, when C.M.B. was first placed with Grandparents, she had tantrums, banged her head, did not sleep through the night, would wake up screaming, did not speak, and was afraid of police men and fire engines. She now sleeps through the night, laughs and plays, talks non-stop, and no longer has tantrums.

### History of Visitation with the Child

In September 2002, the court ordered Parents to have supervised or telephone visitation with C.M.B. Supervised visitation was sporadic at best. Parents had approximately 745 opportunities under the court order to visit C.M.B. but visited less than 40 times. The Guardian Ad Litem went to great lengths to arrange numerous supervisors for visitation. However, Parents continually expressed dissatisfaction with designated supervisors. All of the experts expressed concern that Parents' ongoing actions prevented visitation from proceeding smoothly and with continuity.

### Mother's Employment History

Mother has a college education and graduated from Southern Methodist University. Mother has never sought a job where she could use her college education. Mother was employed as a topless dancer while attending college. Mother admitted to dancing at the gentleman's clubs Illusions Cabaret and Cabaret Royale. Mother denied such employment in the two years prior to trial while under the care of Moore. However, the evidenced showed Mother employed at Illusions Cabaret in April and May 2002 and at Cabaret Royale in August through September of 2002. During the trial, Mother continued to work as a topless dancer. David Cohen, a private investigator, testified to seeing Mother dancing at the Silver City club on the evening of May 20, 2004. Complaining of illness, Mother was not present in court on that day. In an incident on June 9, 2002 at the topless club Illusions, Dallas Police were called to investigate a patron threatening Mother with a gun. During the questioning, Mother became fearful and returned to her home. Officers went to her home to question her regarding the incident and found her very intoxicated and confrontational.

Mother claims to be disabled and too fragile to work. However, Moore testified that Mother was mentally and emotionally capable of looking for work and that it has been Mother's choice not to work.

### Frequent Moves and Evictions since C.M.B.'s Birth

As evidenced by the record, it appears Mother has resided at twelve different locations since the birth of C.M.B. and has been evicted from at least four of those addresses. In a majority of the residences, complaints were filed by third parties regarding incidences of loud noise and fighting between Parents. In each of the evictions, Parents fell behind on the rent, tendered bad checks, had been the subject of complaints for loud noise and fighting, and left the residences filthy after moving.

After a bench trial, the trial court entered a decree terminating appellant's

rights to C.M.B. and appointing Grandparents permanent Joint Managing Conservators. In the decree of termination, the trial court found that appellant knowingly placed C.M.B. in conditions or surroundings which endangered the physical and emotional well-being of C.M.B, knowingly allowed C.M.B. to remain in conditions or surroundings which endangered the physical and emotional well-being of C.M.B., engaged in conduct which endangered the physical and emotional well-being of C.M.B., and knowingly placed C.M.B. with persons who engaged in conduct which endangered the physical and emotional well-being of C.M.B. This appeal followed.

### Termination of Parental Rights

■ Appellant argues there was factually insufficient evidence to support the termination of the parent-child relationship between her and her child. Involuntary termination of parental rights involves fundamental constitutional rights. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re G.M.*, 596 S.W.2d 846, 846 (Tex.1980). The rights "to conceive and raise one's children have been deemed 'essential,' 'basic civil rights of man'", and "rights far more precious ... than property rights." *Stanley*, 405 U.S. at 651, 92 S.Ct. 1208 (citations omitted). The right to enjoy a natural family unit is no less important than the right to liberty. *In re G.M.*, 596 S.W.2d at 847. Consequently, actions which break the ties between parent and child can never be justified without the most solid and substantial reasons. *Juan A. v. Dallas County Child Welfare*, 726 S.W.2d 241, 244 (Tex.App.-Dallas 1987, no writ).

■ Because of the important constitutional rights involved, statutes permitting termination of the parent-child relationship must be strictly construed in the parent's favor, and we strictly scrutinize any effort by the State to terminate that relationship. *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex.1985). Section 161.001 of the Texas Family Code governs the involuntary termination of parental rights. *See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp.2005). To terminate parental rights under section 161.001, the trial court must find both that (1) the parent has committed one of the enumerated acts and (2) termination is in the best interests of the child. *Id.* Each required finding must be based on "clear and convincing" evidence. TEX. FAM.CODE ANN. § 161.206(a) (Vernon Supp.2005).

■ Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002). The standard of proof does not require that the evidence be unequivocal or undisputed. *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979). It does, however, require a greater persuasive force than the preponderance of the evidence standard generally used in civil cases. *Brantmeier v. Brazoria Protective Servs. Unit*, 661 S.W.2d 234, 235 (Tex.App.-Houston [1st Dist.] 1983, no writ); *see also, In re C.H.*, 89 S.W.3d 17 (Tex.2002) (when reversing on insufficiency grounds, reviewing court must detail evidence relevant to issue of parental termination that is clear and convincing).

■ To terminate a parent's rights under subsection (D) of section 161.001, the evidence must show the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emo-

tional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon Supp.2005). Under this subsection, the cause of endangerment must be the child's living conditions. *See In re S.H.A.,* 728 S.W.2d 73, 85 (Tex. App.-Dallas 1987, writ ref'd n.r.e.). To terminate a parent's rights under subsection (E) of section 161.001, the evidence must show the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well being. *See* TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2005). Under subsection (E), the cause of endangerment must be the parent's conduct, as evidenced not only by the parent's acts but also by the parent's omissions. *In re S.H.A.,* 728 S.W.2d at 85.

■ While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the child actually suffer injury or harm. *See Sylvia M. v. Dallas County Child Welfare Unit,* 771 S.W.2d 198, 203 (Tex.App.-Dallas 1989, no writ). Endangerment includes actions that expose the child to loss or injury or jeopardize the child's emotional or physical health. *See Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987).

■ In determining whether terminating the parent-child relationship is in a child's best interest, we must consider the following factors: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the persons seeking custody; (5) the programs available to the persons seeking custody to help promote the best interest of the child;

(6) the plans for the child by those persons seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). Further, a party seeking an involuntary termination of parental rights is not required to prove all nine *Holley* factors as a condition precedent to termination. *In re C.H.,* 89 S.W.3d at 27.

■ Mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship. *Carter v. Dallas County Child Welfare Unit,* 532 S.W.2d 140, 141–42 (Tex.Civ.App.-Dallas 1975, no writ). However, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can be considered in a termination proceeding. *See id.* at 142.

■ It is the duty of the appellate court in reviewing the evidence in termination cases to determine whether the trier of fact could reasonably conclude the existence of the fact is highly probable, not whether it is more likely than not, as in ordinary civil cases. *See Wetzel v. Wetzel,* 715 S.W.2d 387, 389 (Tex.App.-Dallas 1986, no writ). In reviewing a "no evidence" point of error, we consider only the evidence and inferences tending to support the dispositive findings and disregard all evidence and inferences to the contrary. *See Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 83 (Tex. App.-Dallas 1995, no writ). If there is more than a scintilla of evidence supporting the dispositive finding, we uphold the jury's findings. *Id.*

In considering an attack on the factual sufficiency of the evidence, we must consider all of the evidence to ascertain if it is clear and convincing. *In re S.H.A.,* 728 S.W.2d at 86. In other words, a parent challenging the factual sufficiency of the evidence must demonstrate the evidence is so weak that it could not produce a firm belief or conviction in the mind of a rational trier of fact that the challenged finding is true. *See Addington,* 588 S.W.2d at 570.

Mother has a history of ongoing psychiatric and polysubstance abuse issues resulting in her inadequate care of C.M.B. Hospital records from several hospitals detail Mother's ongoing issues and admitted drug use since 1999. Despite recommendations to the contrary, Mother did not seek or pursue additional treatment upon her release from various hospitals. Mother did seek care from Moore in May 2002. Although under the care of Moore for two years, Albritton testified that Mother was still somewhat unstable, fragile, and prone to relapse. Tamez and Lammers agreed with Albritton that Mother had significant psychological problems and would not recommend C.M.B. be placed with Mother.

Numerous family members have expressed concern for C.M.B.'s health and safety when left with Mother. Mother's two sisters testified to caring for C.M.B. at times when Mother was intoxicated. Additionally, the two sisters and the aunt observed mother transporting C.M.B. without a safety seat; alone on a step stairway; alone in the bathtub; allowing and encouraging C.M.B. to eat cat food; leaving prescription drugs easily accessible under the sink in the bathroom; and giving C.M.B. wine to drink.

Father expressed ongoing concerns with Mother's ability to care for C.M.B. and the safety of the child when left with Mother. Father called the police on several occasions to report Mother's violent and unstable behavior. Father reported to family and police numerous threats by Mother to kill herself and C.M.B. On one occasion, Father reported Mother had stated she had already killed the nanny and C.M.B. On other occasions, Father requested the police take Mother to the hospital.

For a majority of C.M.B.'s life, she has resided with the Grandparents. Grandmother was the primary caregiver during that time. Grandmother fed, diapered, bathed and provided general care for C.M.B. Grandmother, sister, and aunt testified that, upon first coming to live with the Grandparents, C.M.B. had difficulty sleeping through the night, banged her head, and overreacted to situations involving police and firemen. However, C.M.B. now sleeps through the night, laughs and plays, talks frequently, and has fewer tantrums.

During the time C.M.B. was in the primary care of Mother, others provided food and baby supplies on numerous occasions. Even when the child was adequately cared for by the nanny, family members testified to providing food and diapers during their visits.

Multiple incidents of violence between Parents, Grandparents, and third parties occurred beginning before C.M.B. was born in August 2000. Parents would fight verbally and physically both in private and in public. Multiple police reports evidence ongoing violence between Parents in Florida and later in Texas. Multiple family members testified to witnessing acts of violence both when C.M.B. was present and when she was absent. On several occasions, Mother was observed screaming at others while holding C.M.B. Mother would yell directly into C.M.B.'s ear and C.M.B. would cry and scream for some time afterwards.

Parents cannot provide the stability and consistency necessary for C.M.B.'s well being. Mother has resided at twelve different locations since the birth of C.M.B. and has been evicted from at least four of those addresses. Numerous complaints of loud noise and fighting were reported in the majority of places. Further, in each of the evictions, Parents fell behind on the rent, tendered bad checks, had been the subject of complaints for loud noise and fighting, and left the residences filthy after moving.

Parents have not demonstrated consistency through supervised visitations. Parents had approximately 745 opportunities under the court order to visit C.M.B. but have visited less than 40 times. The Guardian Ad Litem attempted to provide suitable alternatives for supervisors, but the Parents continually complained and were dissatisfied with the supervisors for various reasons. All of the experts expressed concern that Parents' actions prevented continuity of visitation.

We have carefully reviewed the record and conclude there is more than a scintilla of evidence that appellant engaged in conduct that endangered her child. *See Dupree*, 907 S.W.2d at 83. We further conclude that, based on the evidence in this case, a reasonable trier of fact could conclude by clear and convincing evidence that appellant engaged in conduct that endangered her children. *See Addington*, 588 S.W.2d at 570. Moreover, we believe the record contains clear and convincing evidence that termination is in the children's best interests. *See Holley*, 544 S.W.2d at 371–72. Accordingly, we overrule appellant's first and second points of error.

We affirm the trial court's judgment.