

NUMBER 13-15-00552-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

## IN THE INTEREST OF P.R.W., A CHILD

---

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

---

## DISSENTING MEMORANDUM OPINION

### Before Justices Benavides, Perkes, and Longoria
### Dissenting Memorandum Opinion by Justice Benavides[1]

Appellant B.W. ("Mother") challenges the legal and factual sufficiency of the evidence terminating her parental rights of her child, P.R.W. ("Child"). The majority concludes the evidence is legally and factually sufficient to support the termination of Mother's parental rights. I respectfully dissent.

In reviewing parental termination cases, we must start our analysis by keeping in

---

[1] I agree with the facts as set out in the majority opinion.

mind that "parental rights are far more precious than any property right, and when the State initiates a termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012).

After removing the child on January 21, 2014, in March 2015, the trial court found the Mother to be in compliance with the conditions required by the Department and ordered Child to be returned to Mother. The reunification took place in April 2015.

In June 2015, however, the Department became concerned by behavior Mother displayed during a home visit, as well as Mother having an unknown man, M.L., residing in her apartment. The trial court held an emergency hearing and ordered Child to be returned to M.S. and J.S. for the pendency of the case through termination.

## I. TERMINATION OF MOTHER'S PARENTAL RIGHTS

### A. Statutory Acts or Omissions

I agree with the majority that there is legally and factually sufficient evidence to establish that Mother knowingly placed or allowed Child to remain in conditions or surroundings that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Since only one statutory act or omission is required to terminate parental rights, I agree that the majority does not need to address the other statutory acts referenced by the trial court. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

### B. Best Interest of the Child

I likewise agree with the majority that the standard must decide how to "reconcile 'a parent's desire to raise [the] child with the State's responsibility to promote the child's best interest.'" *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet.

denied) (citing *In re E.R.*, 385 S.W.3d at 555).   Most importantly, "there is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption."   *Id.*

In deciding what is in the "best interest of the child," we look at factors known as the *Holley* factors to make a proper determination.   *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).   However in my analysis of these factors, I find that the Department has failed to meet its burden by clear and convincing evidence to terminate Mother's parental rights.

**(1) the desires of the child**

"When children are too young to express their desires, the factfinder may consider whether the children have bonded with their foster family, are well-cared for by them, and have spent minimal time with the parent."   *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).   "A child's need for permanence through the establishment of a 'stable permanent home' has sometimes been recognized as the paramount consideration in a best-interest determination."   *Id.*   "Therefore, evidence about the present and future placement of the children is relevant to the best-interest determination."   *Id.*

At the time of trial, Child was a toddler, approximately three and a half years old. His wishes and desires directly were unknown to the court.   While the majority states Child did not express or was not mature enough to have an opinion on returning to Mother's care, the testimony presented differs.   M.S. testified that Child would ask M.S. about Mother.   M.S. stated that "sometimes he [Child] asks me do you like my mother?

3

And, of course, I'll tell him yes and he cries and he wants to see his mama. And then he says, my mama has this, my mama has that, and then he'll forget about that." Additionally, M.S. testified, "At one time, he [Child] got so mad about one of our incidents there that he couldn't see his mama, and he went in behind the commode and wouldn't come out." The Department's witnesses also testified that Mother was loving towards Child and would bring him food and interact appropriately with Child during their visitations. It stands to reason based that on M.S.'s testimony, that Child was bonded with Mother, even at his young age.

Even though Child is young, it is clear from his statements that Child desires reunification with Mother. This factor weighs against termination.

**(2) the emotional and physical needs of the child now and in the future**
**(3) the emotional and physical danger to the child now and in the future**
**(8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one**

These three factors will be addressed together. The majority points to Mother's mental health issues as the main reason to support termination under these best interest factors but also refers to "inappropriate relationships," substance abuse, and the inability to find Child's medications when asked.

"Mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship." *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied). "However, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of the child, that conduct can be considered in a termination proceeding." *Id.* It is undisputed that Mother suffers from

4

mental illness that requires medication and was the triggering factor for the Department to remove Child initially.[2]

Regarding Mother's mental health treatment, the majority finds that Mother inconsistently treated her illness. However, the Department presented no evidence to support its assertion. No past or present medical records or testimony from treating providers was introduced into evidence by the Department, except for the medical records from the date of removal. The majority relies on the testimony of the caseworker alone to find that Mother was not medically compliant during the June 2015 removal, even though Mother testified she complied with her medications throughout the pendency of the termination case. Also, the majority disregards the fact the trial court agreed Mother was compliant with the parenting service plan, which included medication compliance, in March 2015 when it returned Child to Mother's custody. Therefore, all the evidence the Department presented of non-compliance was from opinions and speculation. I would weigh this factor against termination.

Another major issue Mother faced during the removal of Child from her custody was positive drug tests. As the Department points out, Mother tested positive for amphetamines on the date of the initial removal of Child. Again in September and November, Mother tested positive for methamphetamines. In December 2014, Mother tested positive for marijuana. It is worth noting, however, that there were also times in 2014 that Mother tested negative for drugs.

Mother had a negative drug test result in early 2015. Although the Department

---

[2] According to the medical records submitted into evidence, Mother was diagnosed with schizophrenia at the time of her commitment.

5

states Mother was asked to take a drug test in April 2015 and did not comply, Cardenas admitted that she never followed up regarding the test and did not ask Mother for any other drug screens once Child was removed from Mother a second time. Therefore, even though Mother tested positive for drugs prior to 2015, she nevertheless showed progress when she tested negative in 2015. I would weigh this factor against termination.

Additionally, no evidence was presented to show that Child had ever been exposed to "drug-using, inappropriate boyfriends" or "inappropriate caregivers" at any point in his life. The only evidence regarding boyfriends came from Mother's testimony about C.B. Mother testified C.B. and her were in a relationship and lived together. Prior to the Department's involvement, Mother testified that C.B. was the cause of Mother's frequent relocations. Mother testified that C.B. was "like, 6'2", and when he talks, people get offen[ded]." C.B. was the only person Mother stated she left Child with other than M.S. while she worked. There were no allegations of abuse, neglect, or drug use made by the Department against C.B. Additionally, there was no evidence of domestic violence or any assaultive charges ever filed against C.B. The only information regarding C.B. came from Mother's testimony. Mother also testified that C.B. was incarcerated at the time of the trial on an unrelated gun charge and did not indicate to the trial court that she would continue her relationship with him after his release. The Department did not question Mother about the future of the relationship with C.B. either.

The Department also referred to M.L. as Mother's boyfriend, contrary to her testimony. Mother stated that M.L. was a "friend" and they did not have a violent relationship. Cardenas testified that M.L. seemed to have a mental illness or be under

6

the influence of drugs in her opinion, but no evidence was presented supporting Cardenas's statement. However, the Department alleged that Mother did not have Child's best interest in mind when she left Child with "inappropriate caregivers" without specifying whom. No other evidence was presented that Mother had left Child with persons that caused concern. This weighs against termination.

However, I believe that an important factor to consider from the record is that in March 2015, the trial court found that Mother had substantially complied with her parenting service plan and returned Child to Mother's custody. The trial court's decision was based on the recommendations from the Department and Child's attorney ad litem, and shows that Mother was in compliance with all the requirements listed on her parenting plan, as well as medications. According to Cardenas, reunification was the ultimate goal in this case. With the trial court returning Child to Mother, I would conclude that Mother was in compliance with the parenting services plan.

I believe that the incident that triggered the June 2015 removal of Child is concerning because the Department should have done more to help Mother. The Department calls a police report admitted into evidence where Mother called earlier in the day a "senseless emergency call" instead of the more positive interpretation: Mother was concerned about Child's health and called for help. Due to the reports received, Cardenas visited Mother and discovered M.L. in Mother's home. Cardenas did not know who M.L. was or if he was residing in the home. Cardenas testified that M.L. was behaving erratically, but on cross-examination, she agreed M.L. was gesturing with his arms which made Cardenas afraid for her safety. Without any additional information, Cardenas told the trial court she believed that M.L. had some sort of mental illness, was

7

on drugs, or both. However, other than Cardenas's opinions based on her observations, there was no other evidence offered.

Cardenas also testified that she believed Mother "was a danger to herself and others that day." But when asked why she did not report the incident, Cardenas stated, "When I was there, I was concerned that she [Mother] was a danger to at least herself or others, but I just was trying to get [Child] out of there." During follow-up questions, Cardenas admitted once Child was safe, she did not report anything. Cardenas does not further describe why or how Mother was a danger to herself or Child; she just said Mother was agitated, making confusing statements, and acting erratically. Knowing Mother's complete situation and why Child had initially been removed, Cardenas could have provided additional help instead of dropping Mother off on a street corner. I would hold that the factors presented above do not favor termination.

**(4) the parental abilities of the individuals seeking custody**

**(5) the stability of the home or proposed placement**

The majority holds that Mother does not seem to appreciate the dangers of her behavior and its effect on her parenting ability. They point to her relationship with C.B. and her drug use. Mother's drug use is very concerning; but her ability to test negative for drugs is a positive factor that shows an ability to change. I do not believe her relationship with C.B. is as troubling as the majority states it to be. Although Mother testified she moved frequently because C.B. "spoke his mind" and "offended people," Mother made efforts to keep her family unit together. Mother also testified that she moved into M.S. and J.S.'s home with C.B., which all parties agree is a stable home environment. Mother also is no longer in a relationship with C.B., so his impact on

8

Mother's life would be minimal at best. I would not factor C.B. into any analysis involved in this case. Mother did not articulate what specifics would be changed in her parenting of Child, but Mother was not pressed during her testimony as to what she can change or what programs she was given access to in order to make changes.

Most concerning is that even though the Department seeks long-term placement with M.S. and J.S., there is no indication M.S. and J.S. would be able to keep Child during the time necessary for the Department to find permanent placement for Child. At trial, M.S. testified that she thinks they can be a long term placement for Child if the trial court terminated Mother's rights. M.S. also stated she has an adult daughter with a terminal illness. M.S. testified to the following:

> M.S.:      We do have other family members and other children and stuff, so I can't forget them either. So, when we say long term, are we talking years? Are we talking months?
>
> Dept.:     When I'm asking long-term, I'm asking can do you do it to age 18?
>
> M.S.:      I don't think so. I'm 75 years old. He'll be taking care of me in ten years.
>
> Dept.:     Okay. And no one's saying that you have to take care of him until age 18. I'm trying to see what his long term options are. You're saying you would take care of him for now, but there's going to come a time when you can't?
>
> M.S.:      Yes.

However, during the pendency of this case, M.S. had to ask for Child to be removed from her home due to her daughter's medical emergency. Even with M.S.'s best intentions, there is no guarantee that M.S. would be able to house Child in the long term. These factors likewise weigh against termination.

9

**(6) the programs available to assist these individuals to promote the best interest of the child**

Mother was ordered to attend counseling and MHMR services as part of her parenting plan. The particulars of what specific treatment providers or programs, however, were not presented to the trial court during the termination hearing. In September 2014, it appears that the trial court ordered Mother to take a parenting class as well. The only information given to the trial court, however, was Cardenas's opinion that Mother did not comply with the services and the prior orders issued by the trial court finding Mother to not be in compliance with the parenting service plan. Additionally, what future programs would be available for Child in his placement home were not discussed. The lack of information presented weighs against termination.

**(7) the plans for the child by these individuals or by the agency seeking custody**

Next, the Department argues that Mother is not consistently stable and this pattern of instability will continue, thus affecting Child. While this argument is worth considering, the Department cannot justify removing a child solely because Mother has a mental illness. *See In re C.M.B.*, 204 S.W.3d at 895. Mother showed compliance with the parenting services plan shortly before the trial was held. In addition, she was testing negative for drugs in 2015. Although Mother stated on the record she would care for Child the same way she had, this statement does not mean she is not capable of being a proper parent. Throughout the time of the termination proceedings, Mother went from testing positive for drugs to testing negative. In addition, she finally was able to comply with the parenting services plan, which we must assume means she complied with the therapies and services required. M.S. testified that when Mother is on her medication

10

for her mental illness, she is fine. Mother testified she was medication compliant and no evidence presented affirmatively disputed this information. Mother's efforts to change is relevant to this analysis.

Additionally, the Department has no long-term plans for Child established. The Department is relying on M.S. and J.S. to keep Child while they try to find a permanent placement. Evidence was presented that shows that M.S. and J.S. will not be able to keep Child in the long term. Mother, on the other hand, made efforts to change her life to keep her son and it should be noted. The evidence shows that Mother has shown she can change out of concern for the best interest of her child by complying with therapy and medications. This factor also weighs against termination.

### (9) any excuse for the acts or omissions of the parent

From the outset of this case, the Department's main concern has been Mother's mental illness. Mother's commitment and diagnosis for mental illness is concerning, but parental rights cannot be terminated due to mental illness alone and without considering any progress made by the parent in managing her illness. *See id.* Mother voluntarily stayed at the hospital following her initial mental health commitment. Mother testified she was taking her medication and the trial court found she was compliant in her parenting services plan in March 2015, which included counseling services and MHMR treatment. This factor weighs against termination.

## II. CONCLUSION

In reviewing the evidence presented under the *Holley* factors, I would agree that the evidence is legally sufficient. *See In re J.F.C*, 96 S.W.3d 256, 266 (Tex. 2002). However, I would hold that the evidence is factually insufficient to support the trial court's

finding that termination was in the child's best interest.   *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curium).   For this reason, I respectfully dissent and would reverse the trial court's judgment and remand this case for a new trial.

GINA M. BENAVIDES,
Justice

Delivered and filed the
17th day of May, 2016.