**REVERSE and REMAND; and Opinion Filed August 29, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00413-CV

## IN THE INTEREST OF M.O. AND P.O., CHILDREN

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-13-19769-Z**

# MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Osborne

After a bench trial, the trial court signed an order appointing Mother and Father as possessory conservators of their children M.O. and P.O. The trial court appointed a nonparent as the children's managing conservator. Mother appeals, contending the trial court abused its discretion in finding that appointing her as managing conservator "would significantly impair the children's physical health and emotional development." Because we conclude there was insufficient evidence to support the trial court's finding, we reverse the trial court's order and remand the cause for further proceedings.

### BACKGROUND

In late 2017, the Texas Department of Family and Protective Services (the "Department") removed M.O. and P.O., then aged 3 and 2, from Mother's home after investigating a report of neglectful supervision. As one of the "reason[s] for Child Protective Services involvement," the Family Service Plan created for the family in November 2017 stated that "[Mother's] unmanaged

mental health issues poses [sic] a threat to the ongoing safety of the children." Under "hopes and dreams for the children," the plan stated that Mother "hopes to receive appropriate mental health and substance abuse treatment so she can be the best parent possible for her children." "Service plan goals" included that Mother "will have a psychiatric evaluation and ensure she is medically compliant if she has already completed one," and "will actively participate in therapy to understand and address her own mental health needs." Mother was ordered to "participate in a psychological evaluation to assess her ability to take responsibility for her children, provide a safe and nurturing environment, and alter the pattern of behavior resulting in CPS involvement," to "attend Individual Counseling," to "complete a Psychiatric Evaluation . . . in order to assess her mental health needs," and to "follow all recommendations made" by the service provider of the psychiatric evaluation. The trial court took judicial notice of the family service plan at trial.

The children were placed in the home of J.J., Father's cousin. Another of Mother's children by a different father, A.M., aged six, was also placed in J.J.'s home. At trial, the Department requested that the court appoint J.J. as sole managing conservator, and Mother and Father as possessory conservators. The children had been living with J.J. since their removal from Mother's home. Also living in J.J.'s home and under her care are her own four children, who range in age from five to thirteen.

While in J.J.'s care, the children visited with Mother at the home of J.J.'s mother, R.J. R.J.'s home was chosen for the visits because R.J. and Mother live in the same apartment complex. But J.J. testified that at the time of trial in February 2019, Mother had not visited or seen M.O. since the previous Mother's Day in May 2018, and had seen P.O. only once since then. Mother testified that she disliked visiting the children at R.J.'s home because she felt that R.J. watched her too closely and "yelled at" her once for "play[ing] with my kids rough." Mother explained that "I don't play with my kids rough. I play with them, and that's what it was."

Both Mother and Autumn Carter, a Department caseworker, testified that Mother had completed all of the services the court had ordered, including random drug screens, a drug assessment, a psychological evaluation, individual counseling, domestic violence counseling, and parenting classes. But Carter also testified that Mother was not "medication compliant" in accordance with the service providers' recommendations.

There was no evidence presented about the children. There was no evidence of M.O.'s or P.O.'s physical health or emotional development. There was no evidence of M.O.'s or P.O.'s relationship with Mother. There was no evidence of M.O.'s or P.O.'s relationship with J.J. or with J.J.'s children. There was no evidence of M.O.'s or P.O.'s physical or emotional issues or needs. There was no evidence of how Mother's medication compliance, or lack of it, impaired M.O.'s or P.O.'s physical health or emotional development.

After hearing testimony from J.J., Carter, Mother, Father, and the Court Appointed Special Advocate for the children (the "CASA advocate"), the trial court granted the relief requested by the Department and signed an order appointing J.J. as sole managing conservator and Mother and Father as parent possessory conservators of M.O. and P.O. Mother now appeals.

## APPLICABLE LAW

"It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." TEX. FAM. CODE § 153.131(b). "[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." FAM. CODE § 153.131(a). "The strong presumption that the best interest of a child is served by appointing a natural parent as managing conservator is deeply imbedded in Texas law." *In Interest of J.T.S.*,

No. 05-17-00204-CV, 2018 WL 1465535, at *3 (Tex. App.—Dallas Mar. 26, 2018, no pet.) (mem. op.) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990), and *In re B.B.M.*, 291 S.W.3d 463, 468 (Tex. App.—Dallas 2009, pet. denied)).

To support a finding of significant impairment, the evidence must do more than merely raise a suspicion or speculation of possible harm. *In re B.B.M.*, 291 S.W.3d at 467. Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions, will probably harm the child. *Id.*; *R.H. v. D.A.*, No. 03-16-00442-CV, 2017 WL 875317, at *5 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd). This is a heavy burden that is not satisfied by merely showing the nonparent would be a better choice as custodian of the child. *In re B.B.M.*, 291 S.W.3d at 467. Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *Id.* at 469. A factfinder may infer the present fitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct. *R.H.*, 2017 WL 875317, at *5. But evidence of past misconduct, standing alone, may not be sufficient to show present unfitness. *Id.* "When a nonparent and a parent are both seeking managing conservatorship, the 'close calls' go to the parent." *In re B.B.M.*, 291 S.W.3d at 469; *see also Interest of F.E.N.*, No. 18-0439, 2019 WL 2667029, at *2 (Tex. Jun. 28, 2019) (per curiam) (proof of "significant impairment" "should include the acts or omissions of the parent demonstrating that result") (citing *Lewelling*, 796 S.W.2d at 167).

## STANDARD OF REVIEW

Mother alleges that the trial court abused its discretion in finding that appointing her as managing conservator would significantly impair M.O.'s and P.O.'s physical health and emotional development. "[A] finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a

preponderance-of-the-evidence standard." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The heightened standards of proof and review for termination decisions do not apply. *Id.* Instead, conservatorship determinations "are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *Id.*; *see also In Interest of L.W.*, No. 02-16-00091-CV, 2016 WL 3960600, at *1 (Tex. App.—Fort Worth Jul. 21, 2016, no pet.) (mem. op.) ("A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.").

Legal and factual sufficiency are not independent grounds of error in conservatorship cases but are relevant factors in determining whether an abuse of discretion occurred. *Id.* at *2. To determine whether the trial court abused its discretion because the evidence was insufficient to support its decision, we consider whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) erred in its exercise of that discretion. *Id.* We conduct the applicable sufficiency review with regard to the first question. *Id.* We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied).

## DISCUSSION

A natural parent has a fundamental liberty interest in the care, custody, and management of her child. *In re B.B.M.*, 291 S.W.3d at 468 (citing *Santosky v. Kramer,* 455 U.S. 745, 753 (1982)). This right cannot be infringed absent evidence that such care, custody, and management by the natural parent would result in physical or emotional harm to the child. *Id.* (citing *Lewelling,* 796 S.W.2d at 167). Although the Department did not seek to terminate Mother's parental rights, and consequently was not required to meet the "clear and convincing evidence" standard of proof applicable to terminations, it was required to offer evidence to "support the logical inference that

some specific, identifiable behavior or conduct of [Mother] will probably harm" M.O. and P.O. *Id.* at 467.

We conclude that the evidence presented at trial, detailed below, was insufficient to overcome "[t]he strong presumption that the best interest of a child is served by appointing a natural parent as managing conservator." *See In re B.B.M.*, 291 S.W.3d at 467. There was no evidence that Mother's "specific, identifiable behavior or conduct," "demonstrated by specific acts or omissions," will probably harm M.O. or P.O. *See id.* At most, the evidence "merely raise[d] a suspicion or speculation of possible harm." *See id.* Consequently, the trial court lacked sufficient evidence on which to exercise its discretion. *In Interest of L.W.*, 2016 WL 3960600, at *2.

At trial, the Department cited its "concerns about Mother's mental health and whether or not she's still getting the necessary help that she still needs" and Mother's failure to visit M.O. and P.O. as grounds for seeking appointment of J.J. as sole managing conservator. The Department, joined by the guardian ad litem, also requested continuation of supervised visitation. Mother requested appointment as managing conservator and return of M.O. and P.O. to her home.

J.J. testified that she had concerns about returning M.O. and P.O. to Mother's custody. Citing Mother's mental health, J.J. expressed a concern that the children's return to Mother might be short-lived because Mother "wasn't willing" to get the treatment she needed. J.J. also testified that Mother "cried and said she just couldn't deal with it anymore, she can't do it anymore" in J.J.'s presence before the children were placed in J.J.'s home.

J.J. also opined that Mother's desire to have the children returned is "all about the benefits" that Mother would receive. In response to questioning by the guardian ad litem, J.J. testified she was contacted by HUD and the IRS because Mother reported to both agencies that the children were living with her when they were actually in J.J.'s custody.

J.J. also testified that Mother's visits with the children had ceased the previous May, so Mother had not seen M.O. for nine months at the time of trial, and had seen P.O. only once in that time period. When the children were placed with J.J. in January 2018, Mother was to have weekly visits. Despite J.J.'s weekly reminders by text message, Mother usually came only twice a month, and then ceased visiting altogether in May. Mother told J.J. why she stopped coming for visits:

> She told me that she didn't want to be bothered with it anymore. I also—she said that she was afraid of my mom [R.J., at whose home the visits were held], the reason why she didn't want to do my visits at my mom's house anymore, 'cause that's where the visitations were supposed to be at. So—but that was the reason why.

J.J. testified that Mother asked her for another place to visit. J.J. suggested they go "right down the street to the park," but Mother said "Oh, no, I don't want to go down there either." J.J. testified that she "left it at that. I mean, I can't force [Mother] to come see the kids. I can only offer."

On cross-examination, J.J. testified that shortly before trial Mother took Valentine cards and cupcakes to R.J.'s home for M.O. to take to school. J.J. also admitted that it was a twenty-minute drive from her home to R.J.'s, and she had not had a car between August of 2018 and the date of trial in February 2019. "[A] couple of times," R.J. picked up the children and drove them back for visits. And J.J. admitted she had been unable to bring M.O. to R.J.'s for a visit at Mother's request in February 2019.

Autumn Carter, the children's caseworker, testified that in September 2017, the Department received a referral of neglectful supervision of M.O. and P.O. "due to Mother's untreated mental illness and possible domestic violence and drug usage in the home." Carter testified that although Mother had completed the services required by CPS, Mother was not following the service providers' recommendations. Specifically, "per the psychological evaluation, it stated that [Mother] needed to be medication compliant." But when Carter visited Mother's home at the end of January, Mother had taken only four pills from each of her two daily prescriptions that had been filled on August 24, 2018. Carter testified,

Q.　　How is that a concern to CPS, that she's not taking her medications? And what's the concern about that affecting her parenting ability?

A.　　Well, the initial referral was a concern—it was neglectful supervision due to Mother's untreated mental health. And her not being medication compliant shows that she's not treating her mental health.

Q.　　And when you tried to talk to the mother about her either going to follow up with her psychiatrist or taking medication, what would she tell you?

A.　　She said she was going to Green Oaks weekly—I don't remember which day of the week. And I told her I needed her to sign a release of information so I could get documentation that she said she would do so. She told me multiple times she would be able to do that, but I still was never able to obtain anything.

Carter testified that Mother did bring a letter to trial from Green Oaks Hospital. The letter was introduced into evidence and reflected that Mother's "diagnoses include Generalized Anxiety Disorder and Depression, not otherwise specified." But contrary to Mother's report to Carter that she was "going to Green Oaks weekly," the letter, dated February 19, 2019, reflects that Mother was "last seen" there in August, 2018. Carter testified that Mother "completed individual counseling that focused on some of the traumas she experienced in her childhood," and based on her review of Mother's psychological evaluation, she had concerns "whether or not [Mother] is mentally stable enough to protect her children." She testified that she had not seen a change in Mother's mental state during the pendency of the case.

Carter also testified that she and Mother discussed Mother's reluctance to visit the children at R.J.'s home. Mother told Carter "she feels a little threatened by the caregiver. She feels uncomfortable, and she feels kind of like the caregiver and her family judges her." Carter disagreed, telling Mother "I don't feel like they judge [you] and they do support [you]." Carter also discussed the matter with J.J., who "actually doesn't understand why [Mother] would feel threatened." On cross-examination, Carter admitted she had not observed any of the visits at R.J.'s home. But she also testified that in her experience it is common for parents to feel uncomfortable

when they are supervised with their children. Carter also testified that Mother never complained that J.J. prevented her from seeing the children.

Mother testified about "what it was like" to visit the children at R.J.'s home:

A.      From my knowledge, when I was there, I would have to sit like a stool pigeon, like I wasn't there, like I was going to run off with my kids. No, I would not run off with my kids because I understand what I would have to do—I would go to jail.

Q.      Why did you feel you had to sit there like a stool pigeon?

A.      Because I felt like I was getting watched hardly [sic]. But I'm not going to harm my kids.

Q.      What caused you to think you were being watched hard?

A.      The way they was looking at me. My [A.M.] and [M.O.], when I'm playing with them, I will tell them, Okay, I can't do that or I can't do that or I can't do that. . . .

Q.      Okay. What happened that caused you to feel like you didn't want to go visit over there any more?

A.      The way—I got yelled at one time in there and everything, and she yelled—[J.J.]'s mother yelled at me, and I didn't like that. That's why I stopped going for a while.

Q.      Okay. And why—what did she yell at you about?

A.      It was one of the kids—I don't know which one it was. I was playing with him—I think I was playing with them rough, and I didn't understand. I don't play with my kids rough. I play with them, and that's what it was.

Q.      Okay. And she yelled at you about that?

A.      Yes.

Q.      What do you mean by yelled at?

A.      Real loud. . . . Like, Don't do that. And I—I—I can admit I am afraid of them.

Q.      All right. And what makes you afraid of them?

A.      Because I don't feel—I feel threatened because I feel that sometimes when I'm around there or when I walk around there—I do reach out—I have reached out to [J.J.] about seeing the kids. . . .

On cross-examination, Mother admitted that although she had attended numerous hearings concerning the court's temporary orders in the case, she never asked either her attorney or the judge to have the visitations changed.

On cross-examination, Carter also testified that she had been to Mother's home. The home is a three-bedroom apartment, so "[t]here are rooms for her kids," and Mother told Carter "she was in the process of getting beds for the kids." The apartment was clean and there was food available. Carter did not see the lease to determine how long Mother would be able to live in the apartment, but all of the utilities were on. When asked whether there was anything unsafe about the apartment, Carter mentioned only the "highly strong smell of bleach," probably because Mother knew Carter was coming and cleaned for her.

Mother testified that "I want my kids back home." When asked if she understood "why the children were removed initially," Mother responded:

A.     Yes.

Q.     And why was that?

A.     Because I know of—when the lady came, she told me that my son—'cause he was with me—and that she needed to see me—see—talk to me. She went to my neighbor and knocked on her door, because I was at the school the day before, with the card on the door saying—she came at me and said that CPS had came to the door and someone called and I called her—she called came a day early to see me. She came way early, and I was on my way to the office to put in a work order, and she said—she asked me, I—CPS, and I told her yes.

Q.     And what was the reason she said she was there?

A.     She said she was there to see me and to see [P.O.] because she said she don't [sic] already seen the girls at school.

Q.     Okay. And eventually, CPS removed the children, correct?

A.     Correct.

The appellate record contains little evidence regarding the nature of Mother's mental illness, the prescribed treatment for it, or, most importantly, its effect on her ability to care for her

children. The initial referral to the Department included a report that Mother "'hurts herself a lot' and is going to hospitals," according to the affidavit of Chasiti Hill, a Department investigator. Hill's affidavit attached to the Department's petition also reflects that when Hill visited Mother on September 28, 2017, Mother stated "that she has Bipolar disorder and schizophrenia. She states that she hasn't been to [G]reen [O]aks in years for treatment and she is not currently taking her medication." The letter from Green Oaks Hospital admitted into evidence at trial shows that Mother's "diagnoses include Generalized Anxiety Disorder and Depression, not otherwise specified; she does have previous diagnosis of Post Traumatic Stress Disorder, though she is not currently reporting symptoms." The letter mentions neither bipolar disorder nor schizophrenia. The ad litem questioned Mother about a report that Mother had a brain tumor, but Mother denied having a brain tumor.

No physician or counselor testified at trial to clarify these matters. The record reflects that a psychological evaluation was ordered for Mother, but no report of the evaluation was introduced into evidence or is otherwise included in the record. Although Carter testified she reviewed the report, the trial court sustained a hearsay objection to Carter's testimony about the report's contents. As we have discussed, Carter testified that Mother did not appear to be taking her prescribed medications as directed. But Carter did not testify about the symptoms that the medications were prescribed to address. Carter testified that Mother promised "multiple times" to provide her records from treatment at Green Oaks, but never did so.

"[A] parent's mental illness diagnosis alone does not necessarily demonstrate that a child's physical health or emotional development will be significantly impaired by parental custody." *In re L.D.F.*, 445 S.W.3d 823, 831 (Tex. App.—El Paso 2014, no pet.); *see also In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied) ("Mental illness or incompetence of a parent alone are not grounds for terminating a parent-child relationship."). In *L.D.F.*, however,

"[a]dditional evidentiary factors ma[d]e Appellant's diagnosis and psychiatric history relevant," including connections between the appellant's psychiatric hospital stays, his use of illegal drugs, and his assaults on family members. *See L.D.F.*, 445 S.W.3d at 831. The court also noted that because the trial court was in the best position to observe the witnesses, it would "defer to its assessments, particularly in mental health cases," as long as "those findings are not an abuse of discretion." *Id.* Consequently, the trial court could consider the appellant's psychiatric history in making its conservatorship ruling. *See id.*; *see also C.M.B.*, 204 S.W.3d at 895 (if parent's mental state causes her to engage in conduct that endangers child's emotional well-being, that conduct may be considered in termination proceeding). In *Sawyer v. Texas Department of Protective and Regulatory Services*, "more than one professional" testified that a mother needed "to be on medication so that she can comply with the responsibilities of being a parent." No. 03-02-00286-CV, 2003 WL 549216, at *8 (Tex. App.—Austin Feb. 27, 2003, no pet.). Noting the mother's failure to follow "repeated advice to return to some form of medication," the court concluded,

> Sawyer [mother] has exhibited a pattern of ignoring the advice of her doctors and therapists. She has not accepted the fact that she is mentally ill and has refused treatment. That refusal endangers her children.

*Id.* Combined with the mother's lack of parenting skill, her drug use, and her contact with abusive men, evidence of her untreated mental illness could support a finding that she "could not provide her children with a safe environment." *See id.*

In contrast to the evidence presented in *L.D.F.* and *Sawyer*, the Department did not offer evidence to support a finding by the trial court that Mother's untreated mental illness will result in "some specific, identifiable behavior or conduct" that "will probably harm" M.O. and P.O. *See In re B.B.M.*, 291 S.W.3d at 467. Consequently, the Department did not offer evidence sufficient to overcome the "strong presumption" that M.O.'s and P.O.'s best interest would be served by

appointing Mother, their natural parent, as managing conservator. *See id.* Carter testified that the Department did not recommend designating Mother as managing conservator because "the issue here was untreated mental health." She testified that Mother had been given additional time—from September 2017 to the time of trial in February 2019—to be medication compliant, but was not. But as we have noted, the Department's evidence did not (1) identify Mother's illness with any certainty, (2) show the effects of the untreated illness on Mother's ability to care for M.O. and P.O., or (3) show probable harm to M.O. or P.O. *See id.* Without evidence that Mother's untreated mental health "would significantly impair" the children's "physical health or emotional development," the Department failed to meet its burden to establish that it is not in M.O.'s or P.O.'s best interest to appoint Mother as managing conservator. *See* FAM. CODE § 153.131(a).

Family code section 153.131(a) "creates a parental preference by placing the burden on the non-parent seeking conservatorship to establish that the parent's appointment [as managing conservator] would result in significant impairment to the child." *Interest of F.E.N.*, 2019 WL 2667029, at *2. Because the Department did not meet this burden, we sustain Mother's sole issue.

### CONCLUSION

We reverse the portion of the trial court's order appointing Mother as M.O.'s and P.O.'s possessory conservator and remand to the trial court for further proceedings consistent with this opinion.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

190413F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF M.O. and P.O., CHILDREN,

No. 05-19-00413-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-19769-Z.
Opinion delivered by Justice Osborne; Justices Schenck and Reichek, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with the opinion.

Judgment entered this 29th day of August, 2019.